JOHN DOE, EX DEM. OF CATHARINE LOUISA BARBARIE, ANN BILLUP BARDE, DANIEL R. BROWER AND ANN B. BROWER, HIS WIFE, CURTIS LEWIS AND ISABELLA LEWIS, HIS WIFE, JOHN T. LACKEY AND MARGARET LACKEY, HIS WIFE, HEIRS AND LEGAL REPRESENTATIVES OF ROBERT FARMER, DECEASED, *v.* MIGUEL D. ESLAVA, AND OTHERS, TENANTS IN POSSESSION.

There were two conflicting claims to land in that part of Louisiana west of the Perdido River; one founded upon a French grant in 1757, with possession continuing down to 1787; the other founded upon a Spanish grant in 1788, with possession continuing down to 1819.

Both these claims were confirmed by Congress.

In an ejectment suit, where the titles were in conflict, the State court instructed the jury, that the confirmations balanced each other, and they must look to other evidences of title in order to settle the rights of the parties.

The judgment of the court being, ultimately, in favor of the party who claimed under the Spanish grant, this court will not, under the circumstances of the case, disturb that judgment.

The fifth section of the act of Congress passed on the 8th of May, 1822, giving certain powers to the registers and receivers of the land office, did not confer upon them the power of finally adjudicating titles to land.

THIS case was brought up from the Supreme Court of Alabama, by a writ of error issued under the twenty-fifth section of the Judiciary Act.

It was an ejectment brought, in April, 1838, in the Circuit Court for Mobile County and State of Alabama, by the heirs of Robert Farmer against Miguel D. Eslava, the Mayor and Aldermen of the city of Mobile, and Joseph Clemens. Eslava afterwards obtained leave to sever in his plea, and thenceforward this suit was carried on against him alone.

The action was brought to recover the following lot of ground in the city of Mobile, viz. : —

" Beginning at a post on the line of the claim of William McVoy, at the distance of twenty-four feet north of the northeast angle of Government Street and Emanuel Street; running thence north sixty-nine degrees east (with the line of McVoy), eighty-nine feet seven inches, to a stake, the southeast angle of a brick cotton-shed, bearing north seventeen degrees west, distant forty-two feet one inch; thence north seventeen degrees forty minutes west, two hundred and twenty-four feet, to the south boundary of the bakehouse lot; thence with said south boundary, south seventy-five degrees fifteen minutes west, eighty-nine feet six inches, to the east boundary of Emanuel Street; thence with said street, south seventeen degrees forty minutes east, two hundred and thirty-four feet, to the place of beginning; containing twenty thousand four hundred and ninety-five superficial feet, with the appurtenances."

Instead of giving a chronological narrative of the events con-

nected with the titles of the plaintiff and defendant, it will best place them before the reader to trace out each title separately.

In May, 1846, the cause came on for trial, when the parties exhibited the following deeds and papers in support of their respective claims.

The title of the plaintiff was as follows: —

1. A patent issued on the 19th of April, 1759, at New Orleans, by Louis de Kerline, Chevalier of the royal and military Order of St. Louis, captain of a vessel of his Majesty, and Governor of the Province of Louisiana, and John Baptiste Claude Bobé de Cloreaux, Counsellor of the King in his Council, Commissary of the Marine, Ordinator in the said Province, to Mr. Grondel. The patent was for a piece of land near the place of the new quarters, at Mobile, called the direction fronting the fort, consisting of about fourteen toises of front upon the esplanade, of the depth which remains of the establishment of the king's bakehouse (*boulangerie du roi*).

2. Mesne conveyances from Grondel to Robert Farmer.

3. That Farmer was a major in the British army, and lived in Mobile; and that when the Spaniards took possession under the treaty which followed upon the close of the war of the American Revolution, Farmer's house was burned and his family moved away to some other residence.

4. After the acquisition and reduction into possession of this country by the United States, Congress passed an act, upon the 25th of April, 1812, appointing a commissioner to investigate the claims to land within it, whose report was to be laid before Congress. In January, 1814, the report of the commissioner, Mr. Crawford, was laid before Congress. 3 Am. State Papers, 6, tit. "Public Lands." This claim appears in the report, but the abstracts show no evidence of inhabitation or cultivation, and the recommendation was, that those claims only should be confirmed in which this proof was made. 3 Am. State Papers, 32.

On the 3d of March, 1819, Congress passed an act confirming certain claims, and organizing a board of commissioners, consisting of the register and receiver, to receive evidence of "all grants, orders of survey, &c., derived from the French, British, and Spanish governments"; and the commissioners were empowered "to inquire into the justice and validity of the claims," and in every case to ascertain the facts relative to their inhabitation and cultivation, and the nature of the survey, if any, abstracts of which evidence were to be reported to the Secretary of the Treasury, to be by him laid before Congress.

Doe v. Eslava et al.

In June, 1820, the claim was presented by Louis de Vobiscey, who had married one of the daughters of Farmer, in the following manner.

" To the Register and Receiver of Public Moneys, acting as Commissioners of Land Claims at Jackson Court-House, Mississippi.

" Gentlemen, — You are hereby notified that the following claims of the heirs of Robert Farmer are now revived, and additional evidence offered in support thereof, to wit: a lot in the city of Mobile, situate opposite to Fort Charlotte, and running fourteen toises (eighty-four feet) front on Government Street, and running back to the public bakehouse (about three hundred feet), which said lot was granted by the French government, by patent bearing date 19th April, 1757, to Mr. Grondel, who, by deed bearing date 22d August, 1757, sold it to Bertrand Guichandene, who, by deed of sale bearing date 18th March, 1759, sold it to Count Pascher, by whom, by deed, lost by time or accident, it was transferred to Robert Farmer, who, according to the evidence hereto annexed, inhabited the same upwards of twenty years, and which is now in my possession in right of the heirs of said Farmer. A translation of the patent is recorded in book C, page 1842, in the books of the former commissioner, but no conveyances under said patent. Therefore, I respectfully request that the said papers herewith filed may be recorded in the order in which they are now presented.

" LOUIS G. DE VOBISCEY."

At the same time, the depositions of Mrs. Bennett and John Baptiste Trainer were filed, showing that Farmer lived on the lot for twenty years; that, on the taking of the town by the Spaniards, the house was burned, and the family moved away.

Upon this evidence, the commissioners made the following report.

" Register of Evidence collected in Relation to Lots in the Town of Mobile.

" No. 27. By whom claimed, Heirs of Robert Farmer. Original claimant, Grondel. Nature of claim, and from what authority derived, French patent. Date of claim, 19th April, 1757. Quantity front, in feet, ——; 84 deep; area in feet, ——. Where situated, Government Street. By whom issued, French government. Cultivation and inhabitation : A house

built, in which R. Farmer lived for twenty years, and until the Spaniards took possession of the country.

·  "*Land Office, Jackson Court-House, July* 11*th,* 1820.

"W. Barton, *Reg.*

Wm. Barnett, *Rec'r.*

"Attest:　　　　　　　　　　　　　　　John Elliott, *Clerk.*"

On the 8th of May, 1822, Congress passed an act, entitled "An act confirming claims to lots in the town of Mobile, and to land in the former Province of West Florida, which claims have been reported favorably on by the commissioners appointed by the United States." Under this act the following proceedings were had by the commissioners, William Crawford, and W. Barton, and William Barnett, register and receiver.

"Transcript from the Register of Certificates granted for Claims to Lots in the Town of Mobile, in the District of Jackson Court-House, Mississippi, contained in Report No. 7 of the Register and Receiver on the Town Lots, and confirmed by virtue of the Act of Congress passed 8th of May, 1822, entitled 'An act confirming Claims to Lots in the Town of Mobile,' &c.

"Number of certificate, 15. Number of claim, 27. Number of report, 7. Present claimants, Heirs of Robert Farmer. Original claimant, Grondel. Nature of claim, French patent. Quantity conferred, front ——, 84 deep, area ——. Where situated, Government Street, Town of Mobile.

"Register's Department, Land Office, Jackson Court-House, Mississippi, January 1st, 1823.

"W. Barton, *Agent.*

"Register of Locations issued for confirmed Claims to Lots in the City of Mobile.

"Date of warrant, 15th November, 1827. Number of warrant, 401. Number of certificate, 15. Number of claim, 27. Number of report, 17. Quantity, ——. Claimant, Heirs of Farmer. Where situated, In Mobile. By whom located, ——. In what manner located, ——. In conformity to the extract of title attached, say 14 toises front, running to the lot of the bakehouse, formerly known to be the king's bakehouse."

5. The plaintiff's next evidence in the chain of title was a patent or quitclaim from the United States, which was as follows:—

Doe *v.* Eslava et al.

" The United States of America, to all to whom these presents shall come, greeting :

" Whereas there has been deposited in the General Land Office a certificate (No. 15) of the register and receiver of the land office at St. Stephen's, with a plat of survey of the lot of land therein mentioned, under the provisions of the act of Congress approved on the 8th day of May, 1822, entitled 'An act confirming claims to lots in the town of Mobile, and to land in the former Province of West Florida, which claims have been reported favorably on by the commissioners appointed by the United States,' as the claim of the heirs of Robert Farmer, in right of Philip Gonjon de Grondel, numbered twenty-seven, in abstract numbered seven of the register and receiver, and as being bounded and described as follows, to wit: Beginning at a post on the line of the claim of William McVoy, at the distance of twenty-four feet north of the northeast angle of Government Street and Emanuel Street; running thence north sixty-nine degrees east (with the line of McVoy), eighty-nine feet seven inches, to a stake, the southeast angle of a brick cotton-shed, bearing north seventeen degrees west, distant forty-two feet one inch; thence north seventeen degrees forty minutes west, two hundred and twenty-four feet, to the south boundary of the bakehouse lot; thence with said south boundary, south seventy-five degrees fifteen minutes west, eighty-nine feet six inches, to the east boundary of Emanuel Street; thence with said street, south seventeen degrees forty minutes east, two hundred and thirty-four feet, to the place of beginning; containing twenty-thousand four hundred and ninety-five superficial feet, English measure, and being a lot in the city of Mobile, in the State of Alabama, in township four south, of range one west, in the district of lands subject to sale at St. Stephen's, Alabama : Now, know ye, that the United States of America, in consideration of the premises, and in conformity with the said act of Congress, have remised, released, and for ever quit-claimed, and by these presents do remise, release, and for ever quitclaim, unto the said heirs of Robert Farmer, and to their heirs, the said land above described, subject to any just claim or claims to all and every part thereof, of all and every person or persons, bodies politic or corporate, derived from the United States, or from either the British, French, or Spanish authorities : To have and to hold the same, together with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging, subject to any such just claim or claims as aforesaid, unto them, the said heirs of Robert Farmer, and to their heirs and assigns for ever, so that neither the

36 *

United States, [n]or any other person claiming under them, except as is provided in said act and the reservation aforesaid, may or can set up any right or title thereto.

"In testimony whereof, I, Martin Van Buren, President of the United States of America, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

"Given under my hand, at the city of Washington, the 14th day of November, in the year of our Lord 1837, and of the independence of the United States the sixty-second.

"MARTIN VAN BUREN,
by A. VAN BUREN, *Secretary.*

"By the President :          . JOSEPH S. WILSON,
   *Acting Recorder of Gen. Land Office, ad. in.*"

6. The last evidence in the chain of the plaintiff's title was proof that the lessors of the plaintiff were the heirs of R. Farmer.

### Defendant's Title.

The defendant then offered in evidence the following, viz. : —

1. "To his Excellency Stephen Meiro, Colonel of the Royal Armies, Political and Military Governor of the City of New Orleans and Province of Louisiana, &c.

"Elizabeth Fonnerette, an inhabitant within the jurisdiction of Mobile, with due respect prays your Excellency, and says, that there is in this town a lot of ground, containing ten toises in breadth by twenty-six toises in length, situate on Government Street, opposite the house and lot of Anthony Narbonne, formerly belonging to Mr. Farmer, which lot has not until the present time been claimed by the proprietor or by any agent in his behalf. In consideration of all which, your petitioner humbly hopes, from the goodness of your Excellency, that you will be pleased to grant her the lot above described, and to order the necessary titles to be issued from the secretary's office of this government ; wherefore your petitioner entreats your Excellency may be pleased to grant the lot prayed for, and, in so doing, your petitioner shall record many thanks. Mobile, 15th February, 1788.

(Signed,)          ELIZABETH FONNERETTE.

"I, Viginti Folch, captain of the regiment of Louisiana infantry, political and military commandant of the town of Mobile and its district, &c., do hereby certify that, from the in-

formation which I have received from various inhabitants of this place, it appears that the facts stated by the petitioner are correct and true. Mobile, March 1st, 1788.

"The commandant of Mobile will put the petitioner in possession of the lot of ground for which she solicits a grant, at the spot described in the preceding memorial, provided the same is vacant, and without causing injury to a third person. Let the proceedings of the survey be made out in connection herewith by the surveyor of the Province, to be transmitted to me, in order to provide the petitioner with the corresponding title in form.

(Signed,)      STEPHEN MEIRO. [SEAL.]"

2. A deed from Elizabeth Fonnerette to Fontanella, in 1798.

3. A deed from Fontanella to Orsono, in 1801.

4. A deed from Orsono to Eslava, in 1802.

The plaintiff objected to Nos. 1, 2, and 3, that they had never been presented to the board of commissioners, and that they therefore could not be read in evidence; which objection was overruled, and the plaintiff excepted.

The plaintiff also objected to Nos. 1, 2, and 3, because they were mere copies from the book of Spanish records, and the originals not even accounted for.

To No. 4 the plaintiff objected, because the paper offered was a mere certified copy from the land office, and did not purport to convey any title to the premises; which objection was overruled, and the said papers, Nos. 1, 2, 3, and 4, were read, and the plaintiff excepted. The conveyance signed by Orsono was produced.

5. It has been already mentioned, that, on the 25th of April, 1812, Congress passed an act appointing a commissioner to investigate and report upon such claims. The next step in the defendant's title was the following evidence of the presentation of the defendant's title before the commissioner in 1814.

"To the Commissioner of Land Claims east of Pearl River.

"Sir, — Please take notice, I claim a lot and house by virtue of a bill of sale to me by Joaquin de Orsono, captain of the Louisiana regiment of infantry, civil and military commandant of Mobile, dated the 20th June, 1802.

"KENNEDY & OSBORN,

*Attorneys and Agents for Don Miguel Eslava.*

"*Louisiana, East of Pearl River, May 24th,* 1814.

"Know all men by these presents, that I, Don Joaquin de

Orsono, captain of the regiment of infantry of Louisiana, commandant civil and military of this town of Mobile, declare to have sold to Don Miguel Eslava the house pertaining to me, wherein I dwell, upon the lot of ground that I bought of Don Francis Fontanella, and built at my own expense; the which I concede to him, free from all encumbrance, for the sum of two thousand dollars, which I have received down, to my full satisfaction; in virtue of which I yield the right of action and ownership that to the said house I had and held, and cede and transfer the whole to the purchaser, who his right shall have, that as his own he may sell or transfer it at his pleasure, without any person opposing his determination; and that it may thus be evident at all times, and for the time being, I make him another sale of the same tract, and sign the present for his security, in the afore town of Mobile, the 30th day of the month of June, 1802.

By duplicate,                                            JOAQUIN DE ORSONO.
" Test:
     THOMAS PRICE,
     CAYETANO PEREZ."

The commissioner, Mr. Crawford, made the following report upon this claim.

### " *Report No.* 11.

" Register of claims to land in the district east of Pearl River, in Louisiana, founded on private conveyances which have passed through the office of the commandant, but founded, as the claimant supposes, on grants lost by time or accident.   No. 79.   By whom claimed, Miguel Eslava.   Original claimant, Joaquin de Orsono.   Quantity claimed in feet unknown. Where situated, Mobile.   Cultivation and inhabitation, 1800 to 1814.   Remarks: Most of those claims of Eslava were purchased at public auction.

" WILLIAM CRAWFORD, *Commissioner.*

" Remarks.   Though the original grants upon which the preceding claims are founded have been lost, yet it is conceived that the claims to such lots as were inhabited and cultivated under the Spanish government, or such as were built upon by permission of the Spanish authorities, ought to be confirmed.
" WILLIAM CRAWFORD, *Commissioner.*"

It has been previously stated, that on the 3d of March, 1819, Congress passed an act organizing a board of commissioners, consisting of the register and receiver, to receive evidence of

grants, and to report to Congress. Under this act the following proceedings took place.

6. A survey, under the following order : —

"Register of Locations issued for Confirmed Claims to Lots in the City of Mobile.

Date of warrant, 10th November, 1827. Number of warrant, 413. Number of certificate, 74. Number of claim, 79. Number of report, 11. Quantity claimed, ———. Claimant, Miguel Eslava. Where located, Mobile. By whom located, ———. In what manner located, 7,200 square feet, including the original buildings.

"*Surveyor's Office,*
*Land District east of the Island of New Orleans.*

"In conformity with a certificate, No. 4, warrant No. 235, claim No. 79, report No. 11, from the board of commissioners at Jackson Court-House, I have surveyed for Don Miguel Eslava a lot of ground within the city of Mobile, in township No. 4, range No. 1, west of the basis meridian, bounded as follows : — Beginning at the northwest angle of Government and St. Manuel Streets, and extending northward, on St. Manuel Street, two hundred and twenty-six feet, and eastward, on Government Street, one hundred and twelve feet. The copy of the conveyance attached to the warrant calls for one hundred and fourteen feet front on Government Street, but it could not be found without interfering with Joyce's Duplantines lot, containing 25,312 superficial feet, of Parisian measure, and having such shape, form, and marks as are represented in the above description.

"The 29th day of October, 1823.

"SILAS DINSMORE,
*Principal Deputy Surveyor.*"

This survey was objected to as evidence, as no warrant or order of survey was shown, nor any confirmation authorizing the same ; which objection was overruled, and the plaintiff excepted.

7. The defendant then offered the following patent certificate : —

"*Land Office, Jackson Court-House,*
*3d September,* 1824.

"In pursuance of an act of Congress passed on the 8th day of May, 1822, entitled 'An act confirming claims to lots in the town of Mobile,' &c., we hereby certify, that the claim of

Miguel Eslava, original claimant Joaquin de Orsono, No. 79, in the report of the commissioners, No. 11, has been confirmed under the said act, and that, on the 29th day of October, 1823, the said claim was regularly surveyed, containing 25,312 superficial feet, of Parisian measure, and designated as a lot of ground within the city of Mobile, in township No. 4, range No. 1, west of the basis meridian, bounded and described as per plat, herewith authenticated by Silas Dinsmore, principal deputy surveyor for the said district.

"Now, therefore, be it known, that on the presentation of this certificate to the commissioner of the General Land Office, the said Miguel Eslava shall be entitled to receive a patent for the above-described lot.

"Wm. Howze, *Register.*
G. B. Damerou, *Receiver.*"

The defendant then proved that the signatures to the patent certificate and the certificate of survey were genuine, and that the officers were at the date thereof such as they purport. This the plaintiff objected to, because not sufficiently authenticated, and for the reasons stated in the objections to the survey. The defendant then offered a report from the land office favorable to his claim, marked No. 7. The claim is found in American State Papers, Vol. III.

The defendant also read the act of Congress of 1822, confirming this claim, and also the act of 1819.

The defendant offered evidence going to prove that Fontanella was in possession of the premises, or a portion of them, in 1801 or 1802; that Orsono afterwards had possession, and built a house thereon; and that, after the date of the bill of sale to Eslava, he (Eslava) exercised acts of ownership over it in making repairs, receiving rent, &c.

That Eslava, on his purchase, obtained the possession, and held it till Vobiscey entered, in 1819; that he rented it out to divers persons; that Vobiscey entered while it was rented by Eslava to a tenant named Ward.

In reply to this, the plaintiff offered evidence to show that one De Vobiscey, who had married one of the heirs of Farmer, in the year 1818 or 1819, took possession peaceably of the said premises, claiming to enter in the assertion of said Farmer's title; and that from that time to the present the said claim has been before the courts of Alabama, as will be seen in the reports of the cases in 2 Stewart, 115, and 3 Stewart & Porter, and 7 Alabama Reports.

The defendant then, to rebut this possession, produced to

the court certified copies of the proceedings against De Vobiscey, marked 8, to show their character, and that De Vobiscey was turned out of possession.

8. The defendant then referred to the original Spanish document set forth under the fifth head of his defence. It was the document signed by Orsono, and in the connection was the proof that Fontanella had been in possession, and had inclosed the lot ; that he had sold it to Orsono, who built a house upon the lot ; that Eslava, the father of defendant, had been in the receipt of rent, during the Spanish times, from about the time the deed bears date ; that he had claimed, and the property had been esteemed as his ; that the government of the United States had paid rent to him, for the use made of it by General Wilkinson after the change of flag ; that he rented it to other persons, and the property was in his possession until he was interrupted by De Vobiscey in 1819 ; that in the latter part of 1819 De Vobiscey entered, and Eslava brought a writ of forcible entry, and recovered possession and retained it till 1821, when the judgment was revoked and a writ of restitution awarded ; that afterwards another writ of forcible entry was brought by Eslava against De Vobiscey, and in 1822 a recovery was had and possession recovered ; that this possession was retained till the year 1826, when this judgment was revoked, and a writ of restitution awarded ; and Hallett, claiming to hold De Vobiscey's title, entered, and the proceedings in an action to try titles on the same day were commenced, and a recovery had, with damages ; and a writ of restitution was executed under the judgment of the Supreme Court, referred to in the reports of that case.

The documents five and six were offered together, and the genuineness of the signatures was proved, and the fact that the officers held the appointments specified at the time they bear date.

The report of this claim, and the confirmation of the government, was also read to the jury. The evidence shows that the heirs of Robert Farmer left this country ; and that, during the Spanish times, and until the return of De Vobiscey, none were known or heard of in the Province of West Florida as claimants of this lot.

It was in evidence that Orsono, at the time of the deed to him, and from him to Eslava, was the Spanish commandant at Mobile.

Before the jury retired from the bar to consider of their verdict, the court charged them as follows : — That, in considering this case, they were not to regard the title from the United

States to either party, as both were confirmed equally, and the confirmations balanced each other, and, to decide the controversy, the jury must look to the other evidences of title. The court further instructed the jury, that, if they believed the defendant, Eslava, and those under whom he claimed, had been in possession more than twenty years before the suit was brought under claim of title, it would be sufficient for his defence ; and that the conveyances produced would be sufficient to connect the different possessions together. The court further instructed the jury, that, the conveyance to Mrs. Fonnerette being shown, if no adverse or other possession appeared, and no reason to the contrary was shown in evidence, and 'the possession was found in her vendee, they would be authorized to presume, if they thought proper, that she was in possession under the concession.

The court further charged, that, if they believed that the plaintiff had been out of possession since the death of Farmer, and until the year 1819, though De Vobiscey had then entered, yet, if he was dispossessed by Eslava by recovering at law with damages, having been out of possession such length of time, his entry was that of a trespasser, and his possession would not prevent the statute of limitations from continuing to run on account of Eslava, he having been restored by competent tribunals.

Before the jury retired to consult on their verdict, the counsel for the plaintiff requested the court to charge the jury as follows : —

That in this State the jury would not be authorized to presume a grant in favor of a direct adverse possession short of thirty years.

That the title of defendant, before confirmation, was a mere equity, and this is not of that character, of color of title, which would support an adverse possession.

That, in order to sustain the defence under the statute of limitations, there must be twenty years' actual, uninterrupted, adverse possession, and this possession must be clearly defined ; which the court charged, but added, that the jury might infer the possession, if they pleased, from the transmission of title from Fonnerette to Fontanella, and from Fontanella to Orsono, and to this defendant.

That the proper concession to Mrs. Fonnerette, her deed to Fontanella, and his deed to Orsono, cannot be received by the jury as evidence of title, so as to connect the defendant's title under his confirmation with them, nor can they look to them as evidence of sales, nor as proof of the consideration, nor as proof of the boundaries claimed.

That if the jury find that De Vobiscey entered upon the premises in 1818 or 1819, with intent to claim, and did claim, in right of his wife, as one of the heirs of Farmer, and held possession under said title during those portions of time he was successful in litigation, this interrupted the possession; and in order to sustain a title under the statute there must be proof of a clear adverse possession of twenty years prior to the time of the interruption; which the court refused, and the court charged that De Vobiscey was a trespasser.

That neither under the claim of Mrs. Fonnerette, nor under the act of Congress, can the defendant claim more than sixty feet front, and that the survey produced by the defendant cannot control this.

That if defendant has put in a plea for eighty-four feet, and shows title for but sixty feet, without designating the precise location of the sixty, the plaintiff must recover. That the paper title produced by the plaintiff is better than the paper title of the defendant.

That the act of 1822, confirming defendant's title, relates only to the title as presented to the commissioners, to wit, the deed from Orsono in 1802, while the same act confirms the title of plaintiff, which relates back to the patent of 1757.

That the legal construction of the bill of sale from Orsono to Eslava gives to Eslava no right to the land in controversy.

That if the defendant claims under the title of Mrs. Fonnerette, he cannot acquire by the statute of limitations more than the title calls for, which is sixty feet front.

To all of which charges and refusals to charge by the court, the plaintiff by his counsel excepts, and prays that his bill of exceptions may be signed and sealed by the court, which is done accordingly in term time.

The jury, under these instructions, found a verdict for the defendant, and the case was carried to the Supreme Court of Alabama. Before it came on for trial, the record was amended as follows.

### " *In Ejectment.*

" JOHN DOE, ex dem. of FARMER'S HEIRS, *v.* M. D. ESLAVA.

" I, Augustus Brooks, clerk of the Circuit Court for the county and State aforesaid, do hereby certify, that it is stated in the original bill of exceptions in this case, that every charge requested by the plaintiff's counsel of the court therein set forth was refused, which statement ought to appear in the transcript of the record, as it is a part of the record, but was

omitted through mistake to be inserted in the transcript made out in the case and sent to the Supreme Court.

"In testimony whereof, I have hereunto set my hand and affixed the seal of said court, this 30th May, in the year 1846. [SEAL.]                                         "A. BROOKS, *Clerk.*

"This record is amended by consent in this: — That it is agreed there is an omission in the bill of exceptions to state that the charges asked for (and appearing in this record) by the plaintiff below were refused by the court, and excepted to by the plaintiff.

"*Tuscaloosa, 4th June,* 1846.

"GEORGE N. STEWART,
*Attorney for Def't in Error.*"

In April, 1847, the cause came on for argument, when the Supreme Court of Alabama affirmed the judgment of the court below. The plaintiff sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Phillips* and *Mr. Coxe,* for the plaintiff in error, and *Mr. Campbell,* for the defendant in error.

*Mr. Phillips,* for the plaintiff in error, made the following points.

The Supreme Court of Alabama has declared that the plaintiff's chain of title "gives no legal right to the premises, and that the lessor is not entitled to recover, although no opposing evidence had been offered by defendant." 11 Ala. Rep. 1049.

This extraordinary conclusion is predicated upon the position that the title of Farmer was forfeited by the conquest, as well as by the stipulation of the fifth section of the treaty between Great Britain and Spain.

That the estate of individuals is not the subject of forfeiture by act of conquest, is a well-established principle in the law of nations, and one repeatedly recognized by this court. Vattel's Law of Nations, 388 ; Wheaton's Law of Nations, 63 ; 8 Wheat. 589 ; 7 Pet. 86 ; 10 ib. 326 ; 12 ib. 412.

Nor does the fifth section of the treaty work this consequence. If, by the law of nations, Farmer's possession would have been secure, would the British government have introduced a treaty stipulation narrowing the right of their own subjects ?

"Her Catholic Majesty agrees that the British inhabitants or subjects may retire in full security and liberty when they shall think proper, and may sell their estates, and remove all their effects, as well as their persons, without being restrained in

their emigration, under any pretence whatever, except on account of debts or criminal prosecutions; the term limited for this emigration being fixed to the space of eighteen months," &c. But if from the value of their possessions they should not be able to dispose of them, a longer time to be granted, &c. Land Laws, 977.

The just construction of this section would seem to be, to stipulate for emigration and removal of property, and that it is introduced out of abundant caution. But if the party did not choose to emigrate, was there to be a forfeiture of his property upon the expiration of the eighteen months? Or suppose he emigrated within that period, but did not sell, did the lapse of time deprive him of the right to do so? The treaty nowhere expressly declares a forfeiture, and to imply it in opposition to the principles of the laws of nations could only be justified by imperious necessity.

Whatever may be the power of the sovereign to regulate the ownership of real estate, and to confine it to citizens alone, it would seem that some special action of the Spanish government was necessary, and that neither the conquest nor the treaty, *proprio vigore,* worked a forfeiture of this estate.

But supposing they did, was it not competent for Spain to have relinquished this forfeiture, and may not this government, the successor of Spain, do the same thing? The admission of the premises of the decision does not at all justify its conclusion, "that the lessor had no right to recover, although no opposing evidence had been offered by defendant."

But it may be said that the act of Congress and the patent which affirm the plaintiff's title expressly reserve the rightful claims of all other persons, and that the defendant's title is within that reservation, and consequently stands unaffected by them.

In 1788, Elizabeth Fonnerette applied to the Spanish Commandant Meiro for the lot belonging to Farmer, "which has not until the present time been claimed by the proprietor or by any agent in his behalf"; upon which an order issued to put the petitioner into possession provided the lot was "vacant, and it caused no injury to any one," and with the further direction, that "a survey should be made by the surveyor of the Province, to be transmitted to me in order to provide the petitioner with the corresponding title in form."

This was the whole transaction under the Spanish government. There is no evidence to show that the party was ever put into possession by the officer to whom the order was directed, nor that she had ever obtained the possession in any

other manner; — no proof, therefore, that the inquiry was ever made that the lot was "vacant," and that the concession would not operate an "injury" to some other person, nor was there ever any "survey" upon which the titles were to be predicated.

It may be remarked, also, that, although this application was made but a few years after the treaty, the lot of Farmer is not spoken of as forfeited, but as unclaimed. The concession to Mrs. Fonnerette gave her no legal title. This is shown, —

1st. By the terms of the concession itself.

2d. By the eighteenth section of the Regulations of Morales, which declares, "that no one of those who have obtained the first decree by which the surveyor is ordered to measure it, and by virtue of which they have been put in possession, can be regarded as owners of the land until their real titles are delivered, completed with all the formalities before recited." Land Laws, 984.

3d. By the repeated adjudications of this court, commencing with the case of De la Croix *v.* Chamberlain, in 12 Wheaton, that such claims did not sever the land from the public domain, and that upon the change of government a political obligation alone existed, which the court could not enforce.

The claim of Eslava, however, was not presented to the board as founded upon this concession, but upon a bill of sale from Orsono in 1802; and this was the only paper filed in the land office. The report of the commissioners shows Orsono to be the original claimant, Eslava the present claimant, and states the quantity claimed as unknown.

It is contended by defendant, that the act of 1822 confirmed this claim, and upon the trial a survey was introduced, made by a deputy surveyor of the United States, to show its extent. This evidence was objected to, because by the acts of Congress the register and receiver were to direct the manner in which the locations were to be made, and the survey was made without their authority. The survey contained 25,312 superficial feet, while the act of Congress under which the claim is set up expressly provides that, where the quantity claimed is not ascertained, it shall be for 7,200 square feet, or 60 by 120. This survey, then, was not only made without due warrant, but in face of the act, and has never been recognized by this government. The survey should, therefore, have been rejected by the court.

The defendant also offered in evidence the concession and certain mesne conveyances to Orsono. The original petition upon which the concession is founded is for a lot ten toises (60 feet) in front; but the conveyances all differ as to the dimensions.

The question now is, What standing has this claim acquired from the action of this government?

As it has been shown that the defendant had only an equity upon the political department, he must be content to take his title with the conditions and under the restrictions which that department has imposed.

The plaintiff having shown a perfect title from the government, the defendant was not at liberty to use in evidence against that title the concession, or the mesne conveyances to Orsono, as they had never been presented to the board of commissioners.

The act declares they shall never be " considered or admitted as evidence in any court of the United States against any grant which may hereafter be derived from the United States." Land Laws, 607; Henderson v. Poindexter, 12 Wheat. 543; De la Croix v. Chamberlain, 12 Wheat. 599; Strother v. Lucas, 12 Peters, 448; Barry v. Gamble, 3 How. 32.

These words are too emphatic and too general to justify the distinction which was taken; for, whether the deeds were introduced as constituting of themselves title, or for the purpose of uniting them to some other matter to this end, they equally fall within the words of the statute and the mischief it was intended to guard against.

But supposing all these documents properly before the court, it is still insisted the defendant is without a legal title.

The act of 1822 does not purport a conveyance of title. While its first section in reference to complete grants recognizes them as valid, its other sections, which affect the defendant's claim, look to future action, — " they shall be confirmed." The final title is reserved to the government until the patent issues. The scope of its provisions, providing for locations by its own tribunals, which are also empowered to decide in cases of conflict, is utterly inconsistent with the idea that the act itself severed the connection of the government.

While, therefore, it is not denied that a complete title to lands may be vested by act of Congress, it is insisted that, under the act of 1822, the title of the government is not divested until the issuing of the patent.   Bagnell v. Broderick, 13 Pet. 436; Wilcox v. Jackson, 13 Pet. 498; Boatner v. Ventriss, 4 Cond. L. R. 653.

Stating the case, therefore, most favorably for defendant, it shows that Farmer and Eslava both held claims to the lot in controversy derived from former governments; but these claims gave no title.   They have both urged their suits before the

37 *

new forum, and Farmer's title has been perfected, while Eslava's remains incomplete.

From 1822 to 1837, when the patent issued which divested the government of its title, there was a special tribunal organized by the act of Congress for the adjudication of this conflict. The defendant has appealed to that tribunal and been defeated, or he has abstained for fifteen years from prosecuting his suit where by law he was directed to do it. The record does not authorize us to say upon which horn he is suspended, but his dilemma is the same in either event.

That this court has jurisdiction of this cause under the twenty-fifth section of the Judiciary Act, reference is made to Matthews v. Zane, 4 Cranch, 382; Ross v. Barland, 1 Pet. 662; Pollard's Heirs v. Kibbe, 14 Pet. 354.

*Mr. Campbell*, for the defendant in error, contended, —

1. That these two claims fell within different sections of the confirmatory act of 1822; that of Farmer being provided for in the fourth section, which merely conferred donations, whilst that of Eslava was comprehended within the third section, which recognized preëxisting rights; and that claims founded upon donations must give way to rights already established.

2. (After showing that the Supreme Court of Alabama considered that both parties were protected by the act of Congress, and that, in order to decide between them, the antecedent conditions of the title had necessarily to be considered, *Mr. Campbell* proceeded,) In this posture of the case, the Supreme Court were led to the inquiries, first, whether the title of the lessors of the plaintiff was not forfeited before the action of Congress upon it; and secondly, whether the possession of the defendant had not perfected his title under the Spanish laws of prescription and the Alabama act of limitation.

We contend that the settlement of the contest between these parties is within the competency of the local tribunals, and that a writ of error does not lie to the Supreme Court of the United States upon their judgments. A solution of this question must be found in the twenty-fifth section of the Judiciary Act, and the interpretation given to it by the Supreme Court of the United States.

The title of the lessors of the plaintiff rests upon the authority of no clause in the Constitution, nor is it protected by any treaty. The title was forfeited by the laws of Spain, when it had unquestioned sovereignty over the country, and was not restored by the act of cession of Spain to the French govern-

ment, nor by any act of the French government. ' The title of the defendant was valid and operative at the date of the cession to the United States, and is within its protection.

The title of the plaintiff is not held under a statute of the United States. The United States, in the act of 8th May, 1822, disavow in favor of the defendant all title to the lot, and if the plaintiff is to be held as comprehended within the third section of the same act, this disavowal operates in favor of the plaintiff. The question, then, is controlled by the decision of this court in 9 Peters, 224. The court there says, — "The controversy in the State court was between two titles; the one originating under the French, the other under the Spanish government. It is true, the successful party had obtained a patent from the United States acknowledging the validity of his previous incomplete title under the king of Spain. But this patent did not profess to destroy any previous existing title, nor could it so operate, nor was it understood so to operate by the State court." The court proceeds to show, that the confirmation of the plaintiff's claim could not operate upon a preëxisting title; that the solution of the controversy between the parties depended upon the opinion that the State court held as to the rights under the titles derived from the crowns of France and Spain respectively; and that the Supreme Court was not entitled to review the opinions of the State court on such a title.

The parallelism between the two cases is perfect. The controversy in the present case is between titles having complete evidences of authenticity. The land in dispute had been severed from the national domain for more than half a century before the occupancy of Mobile under the title produced by the lessors of the plaintiff. The measures of a public character by which it had reverted, and the acts under which it had subsequently become private property, were all antecedent to the American acquisition.

The United States had interfered between the parties only so far as to disclaim all estate in the property, and to furnish the highest evidence of that in an act of Congress. The settlement of the controversies under the preëxisting claim could be of no interest to the United States, nor can the mode of settlement of the question call for the interposition of the national tribunals.

The State court gave to the act of Congress of 1822 all the effect that could be derived from it in favor of the lessors of the plaintiff. It did not pretend that the United States could not waive the forfeiture in so far as it affected its own interests, but that it had not attempted to impair any other title. .

, The decision was, that the disavowal or relinquishment of the United States, in 1822, did not destroy the rights that had vested after the forfeiture of the British grant, and before the passage of the subsequent act of the United States in 1822. This opinion receives full confirmation from the plain declaration in the act of 1822. Congress expressly declares that it is not to be construed so as to affect any other title, but simply to amount to a relinquishment of the title of the United States. The Supreme Court has repeatedly held, that a confirmation in such terms had no relation so as to affect the vested rights of other persons. Les Bois *v.* Bramell, 4 Howard, 459; Barry *v.* Gamble, 3 Howard, 32.

The decision of the State court upon the effect of the act of limitations is clearly not revisable by the Supreme Court of the United States. The State court held that the laws of prescription ran in favor of the defendants, from the time they entered into possession, claiming title. The Supreme Court has acknowledged in several instances the effect of the statutes of limitation upon French titles, and that those acts are not obstructed by the statutes of the United States proposing inquiries into the character and validity of titles. That court held that a party, whose claim had not been forfeited by neglect to present it, was entitled to the benefit of the possession held under the Spanish laws of prescription before the cession, and to the benefit of the local laws of prescription. Strother *v.* Lucas, 12 Peters, 456, 461; Judge Catron's Opinion, 468, 469, 470.

Had the United States set up a claim to this land as its own, and it had been held under that title, we concede that no local *act of limitations* could interfere with its supreme power of control. This has been fully recognized by the Supreme Court. 4 Howard, 169.

The United States made no claim. The claim of the defendant was recognized, because he had adduced proof of title. The United States withdrew all claim to the land, and simply reserved a power to survey it to ascertain its location. This statement of the case shows that the opinions of the State court upon the statute of limitations do not operate to deny a title held under the United States.

The remaining question upon the bill of exceptions, relating to the construction of the act of Congress, arises upon the admissibility of the Spanish title papers of the defendant.

The defendant, at the time (1814) the commissioner appointed under the act of 1812 (1 Clarke's Land Laws, 606) called for evidences of claim, had in his possession only the deed to himself from Orsono. This deed was exhibited, and a fourteen

years' occupancy under it was established. The original grant, and the intermediate conveyances, were not produced. The confirmation of the United States was procured upon this statement of the title of the defendant.

It is a public fact, that, at the time the Spaniards left the country, many of the title papers were carried away. The archives were left in great confusion. In the State of Alabama no order was made respecting the Spanish records until 1821. The act of the General Assembly of that year indicates the disorder which prevailed. Toulmin's Digest, 699.

In the translation of the records, those papers which Eslava had supposed to be lost were found. They show a connected title to Orsono, from whom Eslava claims. The question then arises, Has the act of Congress prohibited the use of these papers in the maintenance of his right? The object of the act was to compel the production of title-papers to the commissioner for the examination of claims. The failure to produce such muniments of title was visited by a prohibition against their introduction subsequently as evidence in the courts of the United States.

This section could not have been designed to apply to the case of a claimant whose claim was substantiated to the government, independently of a paper title, and whose claim had been afterwards recognized by the government. The object of the statute was to protect *bonâ fide* purchasers, or claimants under the government, who had no notice of the dormant Spanish titles. When the Spanish claimant had adduced his claim, supported it by competent evidence, and it had been confirmed, there was no motive for applying a penalty to him, and his case is clearly not within the purview of the statute.

This view of the statute, reasonable as it appears, was not adopted by the State court. The court allowed the Spanish documents of title as evidence of the claim of the defendant, and those under whom he derived title, and of the date of the claim. The admissibility of the evidence was confined in its operation to its effect in establishing a prescription under the statutes of limitation.

The same question arises here which has been discussed in another branch of this cause. Has the Supreme Court jurisdiction over the questions of evidence decided in this case? The act in question prescribes a rule of evidence for the courts of the United States.

Granting the act of Congress to be operative as enacting a barrier against the introduction of any title paper as evidence which has not been registered according to the act, does it ap-

ply to a State court? Can Congress undertake to decide what evidence shall be admitted to support a plea of the statute of limitations in a State court? Can Congress undertake to determine what deeds shall be evidence of title in controversies similar to that now offered to the court? Congress has abandoned all claim to the land, and has conceded that both of the claimants have a superior right to theirs. Is it competent for Congress to dictate the form of evidence by which the title of these parties shall be established in the State courts? The language of the act requires the sanction of no such pretension on the part of the government.

We contend that, when Congress established the title of the defendant, as founded on a grant lost by time or accident, it could never afterwards have designed to contest, or to furnish its citizens with the means of contesting, the existence of their title. The objects set forth in the adjudications of the Supreme Court, as the landmarks of the national policy, forbid such a conclusion. Such a course would have produced confusion, embarrassment, and litigation, when the policy of the government was to promote peace, order, and security.

*Mr. Coxe*, for the plaintiff in error, in conclusion, made the following additional points.

1. That the patent from the United States to the plaintiff must prevail against defendant, who exhibits none.

2. That the report of the commissioners, January 1, 1823, being prior to the patent certificate of defendant, September 3, 1824, confers a prior title of confirmation by the United States.

3. That under said act of May 8, 1822, and other acts of Congress, the lines and boundaries established by the register and receiver, and embodied in the patent, are conclusive as to title as well as to boundary.

4. That, according to defendant's showing, the register and receiver never did authoritatively fix the lines of his lot, and the conveyance annexed to the warrant, and to which the surveyor refers in his plat of survey, had calls which could not be complied with without coming into conflict with other claims.

5. The petition, the foundation of defendant's title, calls for a lot 10 toises (60 feet) in breadth, 26 toises (156 feet) in length. The deed, purporting to be from Elizabeth Fonnerette, appears to be signed by Isabella Fonnerette, and this calls for 60 feet front, 126 feet deep. Francisco Fontanella, not Francis, the previous grantee, conveys to Orsono 114 feet in front and 126 feet in depth; and Orsono, in his conveyance to Eslava, without indicating boundaries, sells the lot which he had purchased from Don Francis Fontanella.

6. Elizabeth or Isabella Fonnerette's deed calls for John Joyce's lot as the northeastern boundary ; and Dinsmore, the surveyor, in his return, says the front of 114 feet could not be found without interfering with Joyce's lot.

7. The original petition of Elizabeth Fonnerette recognizes the claim of Farmer as a prior one.

8. The return of the surveyor gives the lines as surveyed 226 feet by 112, adding one hundred feet to the call of Fontanella's deed.

9. The superficial contents, according to the petition, 10 toises (60 feet) by 26 (156), would be 9,360 square feet ; according to Fonnerette's deed to Fontanella, 68 feet by 126, 7,560 square feet ; by Fontanella's deed to De Orsono, 114 by 126, 14,364 square feet ; by Dinsmore's survey, 226 by 112, 25,312 ; by the register of location, 7,200 square feet. These various documents of title are thus incongruous and inconsistent.

10. The deed from De Orsono to Eslava does not purport to convey the entire property which he had purchased from Fontanella, but uses this language as describing the property conveyed : — " the house pertaining to me, wherein I dwell, upon the lot of ground that I bought of Don Francis Fontanella, &c., I yield the right of action and ownership in the house I had and held."

11. It will be observed that the register says that Eslava's claim is allowed to the extent of 7,200 feet. By the fourth section of the act of May 8, 1822 (Land Laws, 349), it is provided, " that in all such claims where the quantity claimed is not ascertained, no one claim shall be confirmed for a quantity exceeding 7,200 square feet. It is contended that this is an adjudication by the register and receiver, that this was such a claim as was thus restricted as to quantity.

12. That therefore the court erred in refusing, as it appears was done, all the prayers for instructions on the part of plaintiff.

Mr. Justice WOODBURY delivered the opinion of the court.

This was a writ of error on a judgment rendered in the Supreme Court of Alabama.

Our jurisdiction to revise such a judgment is very strictly limited to cases where some right or title was set up by a party under the general government, — its constitution, treaties, or laws, — and was overruled. It is this Federal character of the claim decided against which furnishes some justification for a revision of a State judgment in a Federal court ; and unless it be clearly of that character, the foundation as well as the policy for our interference entirely fails.

So we are confined in our inquiries in a writ of error like this, under the twenty-fifth section, to what appears on the record in some way or other, not only to have been set up under the United States, but decided against by the court. Montgomery v. Hernandez, 12 Wheat. 129 ; Crowell v. Randell, 10 Peters, 392 ; McKinney v. Carroll, 12 Peters, 66 ; Pollard's Heirs v. Kibbe, 14 Peters, 353, 360 ; Coons v. Gallaher, 15 Peters, 18 ; 16 Peters, 281 ; 7 Howard, 743. It must, too, be overruled improperly ; otherwise there is no grievance to be redressed.

As the plaintiff asserts, that such a right or title has in this case been overruled, and that improperly, the burden to show it devolves on him (Garnett et al. v. Jenkins et al., 8 Peters, 86) ; and as the State tribunals are presumed to do their duty, we should not disturb their decisions, even on matters connected with the general government, unless very manifestly improper or erroneous. Carroll v. Peake, 1 Peters, 23 ; 13 Peters, 447 ; United States v. Arredondo, 6 Peters, 727 ; 12 Peters, 435, 436. From the record in this case, it appears that both parties claimed the land in controversy, by titles confirmed by the United States, as well as by long possession at different periods.

The possession by those under whom the plaintiff claims had continued from 1757 to 1787 ; while that of the defendant and his grantors had remained from the last date to the present time, with no interruption except by some legal proceedings between 1819 and 1826, which in the end terminated favorably to the defendant, and left him in the actual occupation of the premises.

The British power, under which Farmer was an officer, ceased a short time before Farmer's heirs left the country, in 1787, and the Spanish power ceased just before their return, in 1819, and for this or some other cause there seems to have been an entire abandonment of the country and of this lot by Farmer's heirs during that period of over thirty years ; and a new license by the Spanish government was, therefore, soon given to those under whom Eslava claims, to enter upon it as a vacant lot ; and an exclusive occupation and building on it, as if their own, followed by them and Eslava during the same period of thirty years, as well as most of the time since.

The principles of law applicable to these possessions, as existing in Alabama, and as to land held under ancient French and Spanish permits and grants, we do not propose to consider ; nor to revise the correctness of the rulings of the State courts concerning them, because they are matters clearly within their

sole jurisdiction. But with the other branch of the case, so far as title was attempted to be proved by the plaintiff from or through the United States, and was decided against, the course should be otherwise, and our jurisdiction must be good to ascertain whether the decision made was a correct one.

Under this consideration, it is doubtful in the outset whether the claim of the plaintiff ought not, on the evidence now produced, to be regarded as a perfect or complete title, derived from the French patent or grant of 1757, to Grondel, and not to be regarded as a title derived from the United States, and to be revised here if overruled in the State courts. Such a title is not to be affected or regulated by the political authorities to whom a country is afterwards ceded, any more or otherwise than any private rights and property of the inhabitants of such a country. United States *v.* Arredondo, 6 Peters, 691; United States *v.* Percheman, 7 Peters, 51, 97; Mitchel et al. *v.* United States, 1 Peters, 734, 744: 12 Peters, 437, 438; 14 Peters, 349, 350.

And when a party, holding such complete title, is encroached upon, he should find protection in the judicial tribunals, as he can get nothing by a resort-to confirmations, or releases, or patents by the political power which acquired the sovereignty over the territory, but not the property itself, "belonging to its inhabitants." Chief Justice Marshall says, in 7 Peters, 87, "The king cedes that only which belonged to him. Lands he had previously granted were not his to cede." And the complete title to them before obtained is strengthened by no confirmation from the United States, who have acquired no interest in them. Garcia *v.* Lee, 12 Peters, 519; 6 Peters, 724.

It is questionable, then, whether the confirmation and qualified patent sought and obtained in this instance from the United States conferred any title, or are to be deemed the true source of the title of the plaintiffs. In this view, it would be a title or right derived from France, and to overrule it is to overrule what is derived from France, and not the United States.

The language of the acts of Congress on this subject (4 Stat. at Large, 700 and 708) seems decisive on this point; as by it the complete grants or titles are "merely recognized as valid," while the incomplete ones of a certain character are "confirmed." In the former, the title has already passed to the possessor before the cession, and no confirmation is needed nor rights required from the United States, they having nothing to grant, whether by a statute, or, as here, by a mere quitclaim patent.

The exceptions or defects in the chain of this title to Farmer

seem by the present proof to. have been all overcome by entry, building, and legal presumptions; though when before the lo-cal officers, both parties appear to have been very unsuccessful in collecting many of the facts and papers since obtained.

But if, as reported by the commissioners, this is to be treated as an incomplete and confirmed claim, the State court do not appear to have overruled the title set up by the plaintiff, so far as derived from the United States. ·They instructed the jury, as to "the title from the United States to either party," that "both were confirmed equally, and the confirmations balanced each other; and, to decide the controversy, the jury must look to the other evidences of title." They accordingly did so look; and as the defendant's grantors, after Farmer's death, and after his family left, entered under a license from the public author-ities, given on the ground that the lot had been abandoned and, was vacant; and as they and Eslava had occupied it since till 1819 undisturbed, and had. been quieted in it again in 1826, and continued there till this time, the jury appears to have found they were not to be disturbed now by any possession or title of Farmer and his heirs before 1787.

Beside this general instruction concerning the confirmations of each title being of equal validity, the court refused to in-struct the jury, though requested by the plaintiff, "that the paper title produced by" him "was better than the paper title of the defendant." This is likewise excepted to.

·But neither of these instructions, whether the general or ·special one, seems to have overruled any title derived from the United States; which was merely a confirmation. On the con-trary, they consider it. as sustained, but the defendant's title thus gotten sustained also, as well as the plaintiff's. It is true, they do not regard the former as better than the latter, and in this view we see no manifest error.

The title of the plaintiff, so far as connected with the United States, consisted of a confirmation of the French grant, and a quitclaim patent. The title of the defendant thus connected consisted of a confirmation of a supposed Spanish concession, and a certificate of this fact, entitling him to a patent, if he wished. Both were confirmed at the same time by Congress. The former, then, is no better as to title than the l ter. A patent like the subsequent one in this case, merely quitclaiming or releasing any right of the United States, gives no title to the patentee superior to what a confirmation had given. Thus, in Grignon *v.* Astor, 2 Howard, 344, the court remarks, — "It has been contended by the plaintiffs' counsel, that the sale in the present case is not valid, because Peter Grignon had not

such an estate in the premises as could be sold under the order of the County Court, it being only an equitable one before the patent issued in 1829; but the title became a legal one by its confirmation by the act of Congress of February, 1823, which was equivalent to a patent. It was a higher evidence of title, as it was the direct grant of the fee which had been in the United States by the government itself, whereas the patent was only the act of its ministerial officers." See also Les Bois v. Bramell, 4 Howard, 463; Strother v. Lucas, 12 Peters, 411; 8 Cranch, 244–249; and 1 Howard, 319, 324. After such a confirmation, no patent is necessary to confer a perfect legal title. Sims v. Irvine, 3 Dallas, 456, 457. The case of Bagnell v. Broderick, 13 Peters, 436; relied on against this conclusion, does not militate against it, but merely holds that, a patent of the fee having once issued on a certificate of purchase, it is not permissible to go back of it and to issue another on the same certificate. See also Boardman et al. v. Read et al.; 6 Peters, 342.

But it is well settled, that a prior claim, independent of any patent, may for some purposes be considered, and be, valid, and for other purposes may be considered as confirmed by the patent. Carroll v. Safford, 3 Howard, 461; 4 Howard, 462; Brush v. Ware et al., 15 Peters, 106, 107; 7 Wheat. 149. A certificate of confirmation, such as Eslava had, is very different from a certificate of purchase, as the former shows that the legal title has already passed, while the latter is merely evidence that it ought to be passed. A patent is necessary to complete the legal title in the last case, but not in the first; though an equitable title for many purposes exists, even under a certificate of purchase, without a patent. 3 Howard, 400; 15 Peters, 93; 5 Cranch, 93; 13 Peters, 498. Again, as both of the titles here relate chiefly to the same land, the junior title might, but for other objections, be allowed under the act of 1836 to be located elsewhere, and then in some sense be deemed inferior. Les Bois v. Bramell, 4 Howard, 449, 464. But Eslava's claim covers more than that by Farmer's heirs. Beside this, it did not originate independent of Farmer's, but on the hypothesis that Farmer's had been abandoned and become vacant, and a title to the lot is set up also under long possession since, by Eslava and his grantors. The superior right is then to be settled under these facts, and not as if double patents had been issued for a title, existing at the same time to the same lot, and from like sources. There are no other questions raised on the record by the bill of exceptions, as to overruling the validity or superiority of either title, in connection with the United States.

Though in the argument, on the side of the plaintiff, the title is contended to be superior, because commencing earlier, notwithstanding it is broken by an absent deed, and because certified earlier for confirmation.   On the other side, the defendant's is insisted to possess a higher equity, because accompanied by a longer possession, an earlier survey, the erection of valuable buildings, and the claimant being both a Spaniard and resident when the country was ceded to the United States.   But the State court does not appear to have given instructions on any of these particulars, or to have been specially requested to do it, and it is questionable whether the legal effect of any of them, if considered, would have been very material to the title, when both titles were treated by the government and the public officers as imperfect grants, and both confirmed at the same time by the same act of Congress.   All the right or title really obtained in either from the United States is a confirmation of a grant and permit made before the cession, and deemed by the local officers incomplete and imperfect.   Yet, so far as derived or held under the United States, each title was of the same rank or dignity and duration with the other.

Some questions arose at the trial concerning the construction of deeds and other conveyances.

In both lines of title, buildings only are in some instances nominally conveyed, and not in terms the lots on which they were situated ; in both, too, some of the boundaries are unsettled, and the quantity of land in dispute by the papers is viewed differently.   But such questions as these are subordinate to the question of title, and proper for the consideration of the State court in exercising its appropriate jurisdiction over local questions, and hence not subject to our revision.   13 Peters, 439 ; United States *v.* King, 3 Howard, 773.

Various other objections connected with the paper title on both sides appear, and almost every year some new difficulty is started in respect to Spanish and French grants, which is perplexing, and which at times seems to bring into doubt parts of former decisions.

But the chief trouble in disposing of this class of cases is in ascertaining the facts, happening under a foreign government, and after such a long lapse of time, and especially when new papers and some new witnesses are frequently discovered ; and the aspect of particular claims is often thus materially changed. Where, however, rights of property have been adjudged, and litigation in some degree quieted, it is much better to regard them as binding, than to disturb or change them, and the actual possession, for slight or doubtful reasons.

The errors in the law of a case, on the facts at any time presented, are not likely to be material, where the Civil Code is the basis of it under Spain and France, and when that and its enlightened equities are well understood, and, with the plain provisions in treaties and acts of Congress, will lead usually to correct conclusions.

Only one other source of title, set up under the United States, remains to be examined. It is a provision in the fifth section of the act of May 8th, 1822, giving to the registers and receivers in this part of Alabama " the same powers to direct the manner in which all lands confirmed by this act shall be located and surveyed, and also to decide between the parties in all conflicting and interfering claims, as given in " another act mentioned, 3 Statutes at Large, 700. It is contended that in 1837 they decided such claims, concerning titles between these parties, and decided them in favor of the plaintiff, and therefore that the State court should have instructed the jury that his title was the better one.

But we do not consider that the act of May 8th, 1822, and that of the same date which is connected with it and referred to as *in pari materia* for a guide (p. 708), meant to confer the adjudication of titles of land on registers and receivers (7 Peters, 94). Those officers are not usually lawyers, and their functions are in general ministerial rather than judicial.

Sometimes, as in the case of preëmptioners, they are authorized to decide on the fact of cultivation or not ; and here, from the words used, no less than their character, they must be considered as empowered to decide on the true location of grants or confirmations, but not on the legal and often complicated question of title, involving also the whole interests of the parties, and yet allowing no appeal or revision elsewhere.

The power given to them, as before quoted, is to decide only how " the lands confirmed shall be located and surveyed " (p. 700). The further power " to decide on conflicting and interfering claims " should apply only to the location and survey of such claims, which are the subject-matter of their cognizance ; and on resorting to the reference made to the second act of Congress, that act appears to relate also to decisions on intrusions upon possessions and kindred matters (p. 708).

The language concerning this is, if conflicts arise, these officers, in settling them, shall " be governed by such conditional lines or boundaries as may have been agreed on " before the act passed, &c. (p. 708). So far from professing themselves to act on titles, in cases of conflict, they usually take evidence or settle boundaries alone.

38 *

The map from the surveyor's office in Alabama, of 22d April, 1837, confirms this.   It is a mere location and survey of the different tracts ; and the register of the warrant is entitled by them, " Register of Locations issued for Confirmed Claims," &c.

So, in cases of commissions to settle land claims, Congress seldom intrusts the final adjudication of titles to them, but requires them to report their opinions ; and the titles are rejected or confirmed by Congress, as seems most proper under all the evidence on a revision of it.   7 Peters, 95 ;  12 Peters, 453.

The language changes in the acts of Congress when the local land officers are to act in any way on titles, and the expression is distinct, " titles and claims," as when asking them for evidence to be reported, as is some imes done in respect to titles. See act of March 3d, 1827 (4 Stat. at Large, 240).   Or it is " titles to be referred to and confirmed by Congress " (1 Land Laws, 437).   Or it is expressed that this decision shall not " be construed to prevent or bar the judicial decision between persons claiming titles to the lands confirmed."   Under these considerations, we do not feel justified in changing the judgment rendered in the State court.   Beside the cases already referred to in support of this conclusion, we would quote, as in several respects directly in point, McDonogh *v.* Millaudon, 3 Howard, 706, 707.

Judgment affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Alabama, and was argued by counsel.   On consideration whereof it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.