HALL *et als.* vs. DOE *ex dem.* ROOT.

1. A party whose title to land situated within the territory of Louisiana was complete by grant from the Crown of Spain while that power held dominion over the country, may successfully assert his title against any claimant under the United States Government, if the grant has not been rendered inoperative as an instrument of evidence by his failure to exhibit it for registration as required by the act of Congress

2. In respect to incomplete titles, if a claim was such as would have bound the conscience of the former sovereign to perfect the title, and furnish the evidence necessary to support and maintain it, the United States Government having acquired the territory would take it charged with the duty of carrying out in good faith the obligation of the previous Government existing at the time of the cession.

3. But when an incomplete title is perfected either by act of Congress or by patent, the United States, and not the previous Government, must be regarded as the source of title.

4. When a party claiming land in the ceded territory is obliged to appeal to the political power of the United States Government in order to perfect his title, or to obtain the evidence of title, that Government has a right to prescribe the terms or conditions upon which such confirmation or recognition will be made ; provided those terms or conditions are not inconsistent with the performance of the duties and the faithful discharge of the obligations imposed upon it by the transfer of the ceded territory.

5. When two claims to the same land are confirmed by the United States Government, the parties are remitted to their rights derived from the former Government, the effect of the confirmation being to place each party *in equali jure,* so far as the action of the Government is concerned.

6. A title to land situate within the territory of Louisiana, derived from the Spanish Government, the written evidence of which was never presented to the United States Commissioners, nor recorded under any of the different acts of Congress, cannot be received in evidence against any grant derived from the United States.

7 But the unrecorded evidence of such title, and the mesne conveyances connecting the defendant therewith, would be admissible to show an adverse possession under color of title, so as to protect the party in possession under the statute of limitations.

8. A claim founded on an alleged Spanish grant, (the written evidence of which grant has been lost by time or accident,) which has never been confirmed by act of Congress, cannot defeat an action of ejectment,

Hall et als. v. Doe ex dem. Root.

by one whose claim, founded on a Spanish concession, was presented to the United States Commissioner, reported for confirmation by him, confirmed by the act of Congress of 1822, located and surveyed under the warrant of the Register and Receiver, and consummated by patent from the United States.

9. A claim to land within the Territory of Louisiana, which the Commissioner reports to Congress as having been formerly inhabited and cultivated, but does not say that such inhabitation and cultivation was under the Spanish Government, cannot be considered as having been recommended by him for confirmation.

10. A plaintiff shows a sufficient title to maintain an action of ejectment, by showing that the original claim upon which his title is founded was presented to the United States Commissioner, reported by him for confirmation, confirmed by the act of Congress of 1822, located and surveyed under the warrant of the Register and Receiver, and consummated by patent from the United States Government.

ERROR to the Circuit Court of Mobile. Tried before the Hon. John Bragg.

JOHN T. TAYLOR, for plaintiffs in error:

The act of 1822 confers no title on the defendant in error, or those under whom he holds ; it is nothing more than a relinquishment of any claim on the part of the government, and both parties in this case must depend upon their rights, independent of the confirmations.—Eslava v. Farmer's Heirs, 7 Ala. 553 ; S. C. 11 ib. 1028 ; 2 How. U. S. R. 285 ; 3 Ala. 47.

The confirmation and patent can only be made available when offered in evidence against one holding under the United States by subsequent grant.—See the wording of the confirmation, 1 Land L. 832, § 2, and the authorities above cited.

The plaintiff below should therefore have shown a good title in himself independent of the confirmation, and in this he entirely failed, 1. Because the permit and occupation, if proved, show no rights whatever that our courts will recognize ; 2. Because no permit or any evidence of title from the Spanish Government was proved, (the mere copy of, or what purports to be a copy of a permit made out by the plaintiff himself, and attached to his claim presented to the commissioner, is no proof of the document,) nor was the evidence taken before the commissioner any proof ; 3. Because the Spanish law required that all persons

holding permits and other imperfect claims must apply to the Governor to have their lands located and final titles made within a certain time, or their claim should be forfeited.—2 White Rec. 240, Art. 22. The Spanish Government never regarded a permit as any title whatever.—2 ib. 239, Art. 18. Cornelius Dunn never complied with this law, and his claim forfeited and reverted to the Government; 4. Because when John Linder, then living on his Lusser tract, had it surveyed early in 1800 by the authorized Spanish surveyor, in obedience to the law before referred to, and it was ascertained that it covered Dunn's settlement, he acknowledged the superiority of Linder's titles, surrendered to him the possession, and left.—Bossier v. Marlin, 5 Martin (new series) 33, and ib. (old series) 678. If, therefore, the defendant below had showed no title at all, the plaintiff ought to have failed, as was the judgment of this court in the case of Farmer's Heirs v. Eslava, (11 Ala. 1028.) But the defendant did show a most complete title, the evidence of which was—1. Title from Bienville and Solmon, governors and ordinators, to Madam De Lusser, in the year 1738, and from her in a regular chain of conveyances to Hall. This title, it is seen, is more than an hundred years old, and possession has accompanied the title during the whole of that time, and John Hall is now in possession. This is sufficient to prove that the title and possession have never been separated and would seem to make our title complete.—See Farmer's Heirs v. Eslava, 11 Ala. 1028. But the plaintiff below contends, that it is void because it was never presented to the Land Commissioner, according to the act of Congress of 1812. In reply to this, we say the claim was filed and recorded in Spanish archives, together with the plat and survey, before the treaty of 1800 or 1803, and was regularly transferred to our records. The claim was also presented by Daniel Johnson to the Land Commissioner at St. Stephens. Whether it was afterwards recorded, or recommended, or confirmed, was a matter for the officers of the Government. The title could derive no aid from any action of the Government, and none consequently was asked. This would be a sufficient compliance under the act, if it was necessary to insist upon it; but I contend that this being a complete grant, separate from the general domain, and recognised as private property by all the preceding governments under which it passed, it stands en-

tirely independent of any action on the part of the Government of the United States, and was perfectly good without any presentation at all.—Levorgne v. Elkins, 17 Louisiana, 220; Treaty of Paris, Land Laws, 1 vol. 519, Art. 3; 4 Louisiana, 272; 7 Ala. 882; Strother v. Lucas, 6 Pet. 772; 1 White's Rec. 714–15–16; 7 Pet. 90–3, 88; 12 ib. 744; 14 ib. 396, 421; 7 Ala. 557; 2 Pet. 310–14–15. And besides, this act (and none of its predecessors on the subject) does not propose to make the titles entirely void, but only that they shall not be read in evidence against any one holding under the United States. Now the plaintiff below holds not under the United States, but under the Spanish Government.

But even if our title was defective, it was nevertheless good against the plaintiff, as an outstanding title, unless the statute of limitations affected it, and that was a matter entirely for the jury. The judge's charges can in no particular be aided by what might be supposed to be the effect of the act of limitations, for the jury alone must determine upon that.—Farmer's Heirs v. Eslava, 11 Ala. 1028. I conclude, therefore, that the title of Mr. Hall was the best, or at least should have been fairly left to the jury, under the questions of fact arising under the titles.

But suppose the court should be of the opinion that the title of the plaintiff below was the best, then the question arises, how much and what land does his title call for, and I insist that it does not extend North of Potatoe Bayou. The act of 1822 does nothing more than confirm the title. We therefore have to go back to the original permit, to ascertain how and where to locate it, and from an inspection of that instrument nothing is clearer than that the whole claim was permitted, on the Eastern shore of the Tensaw, South of the Bayou, or on the "South bank of the Bayou, extending three miles in ascending it," (the Bayou.) There is not a particle of evidence that Dunn even ever asked the Spanish Government for one foot of land North of the Bayou, but all on the South bank. The owners of the De Lusser title were then in possession of the land above, and had been for nearly seventy years. If he had asked for a permit above the creek he could not have got it, because he could never have proven that it was vacant, as was then required. But he never, in his life time, claimed above; his settlement and improvements were all below, according to his permit. Not one of

his cattle was ever known to be above the Bayou, because he knew his "Cow Range," accrued from the Spaniards, did not extend above it; and I further contend that no claim has ever been presented to the Land Commissioner for one foot of land North of the Bayou, nor has any recommendation or confirmation ever been passed, touching any claim North of the Bayou. The claim filed by Thomas Dunn, in 1813, calls for land on the "South bank of the Bayou," and the claim filed by Byrne in 1820, calls for land South of the Bayou. The survey and patent therefore are contrary to the claim and confirmation, and are void as to land North of the Bayou, and there was no use of going into equity to set it aside.—Pollard's Heirs v. Files, 3 Ala. 47 ; Mayor & Aldermen v. Farris' Heirs, 6 ib. 738 ; Stoddard v. Chambers, 2 How. U. S. R. 285 ; Baldwin v. Stafford, 10 Martin, 364.

PHILLIPS, *contra* :

The title of the plaintiff consists in the Spanish concession, report of commissioners, confirmation by act of Congress, the survey made under the act, and the patent issued in conformity with the survey.

This title on paper is complete, unless the objection of the defendant, and the only one he has offered, can be made good, to wit: that by the true construction of the Spanish permit, no land was granted North of the Potatoe Bayou, and that the patent is therefore void for so much at least as covers this portion of the land.

The defendant having called upon the court to give to the jury the true construction of this document, the court considered the most reasonable construction to be the one adopted by the government.

We think this construction to be the true one, but whether true or false, is wholly immaterial. It may be admitted that the Spanish permit, though made in 1796, at a period when Spain was doubtless the true owner of the land, did not sever the land from the royal domain. The legal title still remained in Spain, until by formal transfer, it passed to the grantee. If Spain had continued its dominion over the country, it would have construed its own grant in directing and approving the survey ; and the courts would not have been permitted to defeat a title founded

Hall et als. v. Doe ex dem Root.

on a governmental survey, in a collateral proceeding, upon the ground that an erroneous construction had been given by the government to its own incipient grant.

The change of government has had no other effect than to impose upon us the obligations and the rights which existed before the change, and the same rule will govern this court. If a fraud were practised upon the government, or a mistake committed by it, the government could be relieved by a direct proceeding in the nature of a *scire facias*, but a third party cannot set up these matters in a collateral issue.

The plaintiff has therefore exhibited a complete title, originating with the Spanish Government and perfected by our own, and must recover, unless defendant can show that he has a superior title, derived from the same sources.

The defendant's title is shown by his application to the board established by this government. John Linder applies in August, 1814, as the agent of Daniel Johnson, for 5000 acres, by virtue of a grant lost by time or accident, given by the Spanish Government in favor of John Linder the elder, and by him devised to his grand son, John Linder, from whom Johnson purchased by deed, in 1803.

The report of the commissioner, made in 1816, recommended that the claim should be confirmed for a "reasonable quantity." 3 S. P. § 10, 6, 31. What this reasonable quantity consists of, has never been ascertained.

The act of Congress of 1819, provides that when there has been no survey, or no survey recorded, the claim shall be confirmed for twelve hundred and eighty acres as a donation, (Land Laws, 759,) and this act requires these claims to be surveyed. This also is the requisition of the act of 1822.

The claim of the defendant is, therefore, imperfect, both as to its location and title.—Farmer's Heirs, 11 Ala. 1042.

If defendant insist that his title was confirmed as it originally existed, what title would be referred to? Clearly to the grant of the "Spanish Government to John Linder the elder." But upon the trial there was no attempt to show that such a grant had ever existed. The only attempt made was to show a Spanish grant to an entirely different person. To prove his title, then, independently of the action of this government, defendant offered the papers in reference to the DeLusser title, for the

384 ALABAMA.

Hall et· als. v. Doe ex dem. Root.

purpose of· showing title to himself claiming under them. But·
these documents having never been presented to the Board of·
Commissioners, were properly rejected as title papers.—Land·
Laws, 607 ; Henderson v. Poindexter, 12 Wheat. 543 ; De
LaCroix v. Chamberlain, ib. 599 ; 6 Pet. 771 ; Strother v.
Lucas, 12 Pet. 448 ; Barry v. Gamble, 3 How. 32 ; Hallett v.
Eslava, 3 S. & P. 120.

The defendant's claim has never been confirmed at all. The·
act of ·1819 operates upon the report of· 1816, and this report
recommended for confirmation such claims only as " were inhab-·
ited and cultivated under the Spanish Government," and this,
for a " reasonable quantity."

There is no evidence furnished in the report of this essential·
requisite to the confirmation, and the act only confirms such as·
the commissioner recommends for confirmation. The evidence of·
the abstract· shows that it was " inhabited· and cultivated," but
does not show that it was in " Spanish times," and this is ac-
companied with the observation of the commissioner that the bill
of sale which was presented as the foundation of this claim was·
" altered."·

But not only is there an entire absence of proof in the report
of the commissioner as to this matter, but there is the same de-
ficiency in the certified copy of the proceedings from the land
·office. No proof was ever made to the commissioner to show
that the inhabitation and cultivation was in Spanish times, as
was done, with but one or two exceptions, in the sixty-seven
claims included in this class. In all the other cases the period
of occupation is expressly stated, and when the commissioner·
makes his report, he therefore distinguishes those exceptions·
from the other claims, not by their specific numbers, but
by the fact of " inhabitation or cultivation under the Spanish
Government,"· recommending that those only should· be confirm-
ed. The recommendation, therefore, does not include cases of
inhabitation and·cultivation under the British, French or Amer-
ican Government, but is confined to the Spanish Government
alone. No further presentment of this claim was ever made,
·and consequently it is only to be found in the report of·1816.

In compliance with the provisions of the act of 1819, the re-
port of 1820 was made, which is acted upon by the act of 1822.
It is insisted that· the act of 1822 does .not operate upon the·

claims contained in the report of 1816, except such claims as may be found again presented in the report of 1820. And it is further insisted that the defendant's claim is not confirmed by the report of 1816, and act of 1819. But if it were so confirmed, it could only be for 1280 acres, and not for 5000, as set up by the defendant. The defendant, therefore, under the most favorable view, had no such right as could have barred the recovery.

The patent was properly issued to Thomas Byrne, although he was but the representative of the heir of Dunn. If Byrne had insisted upon holding the title from the heirs, it would have given them a right to the protection of the court of equity, but the patent properly issues to the claimant.—Strother v. Lucas, 6 Pet. 763; S. C. 12 ib. 458; Stoddard v. Chambers, 2 How. 316.

CHILTON, J.—This was an action of ejectment brought by the defendant in error against the plaintiffs in error, to recover a certain tract of land situate in the county of Baldwin, the venue having been changed to the Circuit Court of Mobile.

The questions for revision in this court arise solely out of a bill of exceptions which was sealed by the presiding judge upon the trial in the court below. The titles under which the parties respectively claim the land are set out, and the defendants below asked the court for several instructions to the jury, which were refused, and to which refusal they excepted, as also to several charges which the court gave, involving the relative merits of the titles.

Before proceeding more particularly to notice the several charges refused and those given, it will conduce to a better comprehension of the case and greater perspicuity in its decision, briefly to state some principles applicable to it, which may be drawn from the decisions of our own, and the courts of the United States, as also to collate the several statutes passed by Congress, upon the construction of which the titles are made to depend.

And first, we may remark, that had the title of either party been complete by grant from the crown of Spain, while the territory belonged to that country, then the party having such complete title could have asserted it and made it available to defeat

any claim of title derived from the United States; for in such case, the land before the cession by the treaty of Ildefonso to France, and by France to this government by the treaty of Paris, had become private property, and a cession of territory is not a cession of the property belonging to its inhabitants. "The king cedes that only which belonged to him. Lands which he had previously granted were not his to cede."—Per Chief J. Marshall, United States v. Pecheman, 7 Pet. 87; Doe v. Eslava *et al.*, 9 How. 445. As to the effect of a failure to exhibit such grants for registration, we will speak hereafter.

In respect to incomplete titles, it may be safely asserted as a correct proposition, that if the claim was such as to have bound the conscience of the former sovereign to perfect the title, and to furnish the evidence necessary to support and maintain it, this government, having acquired the territory, would take it charged with the duty to carry out in good faith the obligation of the previous government existing at the time of the cession. In such case, the former government, never having parted with the title, it would devolve upon this government, but charged with the duty, on the part of the United States, of conferring it upon the person justly entitled. When perfected either by act of Congress, or the usual evidence of a grant, a patent, this, and not the previous government, must be regarded as the source of title.

In the next place, we think it very clear that in cases where the parties claiming land in the ceded territory must, in order to perfect their titles, or to obtain the evidence of title, appeal to the political power of the government of the United States, that government has the right to prescribe the terms or conditions upon which such confirmation or recognition will be made by it, provided those terms or conditions are not inconsistent with the performance of the duties and the faithful discharge of the obligations imposed upon it by the transfer of the ceded country to it.

In order to ascertain what these obligations were, and to enable this government in good faith to meet and discharge them, and further, to enable it to proceed and make sale of the public land without the hazard of invading the private rights of those claiming under the former governments, by an indiscriminate sale of the whole territory, it was necessary that steps should

be-taken to ascertain who laid claim to these lands, and the por-
tions so claimed. It was also necessary to determine the char-
acter of the claims so that it might be seen whether it·was in-
cumbent on this government to recognize or affirm them. To
ascertain these titles and claims, the act of 1812 was passed,
authorizing the appointment of commissioners and prescribing
their duties.—Laws of the United States by Story, p. 1235.

By the third section of this act, the commissioners were re-
quired, after having attended a reasonable time in the respec-
tive parishes, to establish offices in such districts respectively at
some convenient point, of which they were to give public notice,
and claimants were allowed to deliver the notices and evidences
of their claims within six months after the offices were estab-
lished, and the claims should be placed in the same condition as
if said evidences, &c., had been delivered while the commis-
sioner was in the parish making his investigation.

The fourth section provides "That every person claiming
lands in the tract of country aforesaid, by virtue of any grant,
order of survey, or other evidence of claim whatsoever, derived
from the French, British or Spanish governments, shall deliver
to the commissioner for land claims, when attending for the pur-
pose in the parish where the land claimed may lie, a notice in
writing, stating the nature and extent of his claims, together
with a plat (in case a survey shall have been made) of the tract
or tracts claimed; and shall deliver to the commissioner when
attending as aforesaid, for the purpose of being recorded, every
grant, order of survey, deed, conveyance, or other written evi-
dence of his claim, and the same shall be recorded by the clerk
in books to be kept for that purpose, on his receiving from the
party or parties, at the rate of twelve and a half cents for every
hundred words contained in such written evidence of their claim;
provided, however, that where lands are claimed by virtue of a
complete French, British, or Spanish grant, it shall not be ne-
cessary for the claimant to have any other evidence of his claim
entered at large upon the record, than the original grant or pa-
tent, together with the order of survey and the plat; all of the
other conveyances or deeds may be abbreviated in the entry; 
but the claim of title and the date of every transfer shall appear
on the record; and if such person shall neglect to deliver such
notice in writing of his claim, together with the plat, (in case

the lands claimed shall have been surveyed) as aforesaid, or cause to be recorded such written evidence of the same within the time and times aforesaid, his claim shall never after be recognized or confirmed by the United States; nor shall any grant, order of survey, deed, conveyance or other written evidence, which shall not be recorded as above directed, ever after be considered or admitted as evidence in any court of the United States, against any grant which may hereafter be derived from the United States."

The fifth section empowers the commissioners to enquire into the justice and validity of the claims filed before them, the evidence relating to which is required to be recorded. By this section, it was made the duty of the commissioners to ascertain, 1st, whether the lands claimed have been inhabited and cultivated; 2d, at what time such inhabitation and cultivation commenced; 3d, when, by whom, and under what authority, such land was surveyed; and they were further required to examine into every other matter affecting the justice and validity thereof, and were invested with the power of compelling the attendance of witnesses, and of administering oaths, &c.

The seventh section requires the commissioners to prepare abstracts from the records of the claims filed, which shall contain the substance of the evidence adduced in support of them, with such information and remarks as may be necessary to a proper decision thereon, which abstracts were to be reported to the Secretary of the Treasury, and by him to be laid before Congress at the next session thereafter, for their determination thereon.

The eighth section requires the commissioners to collect and report to Congress a list of the actual settlers on the land, who have no claims to land derived under either the French, British, or Spanish governments, and the time when such settlements were made. These are the important provisions of the act of 1812. The act of 18th April, 1814, extended the time for delivering notices, and the evidences of claims, until the 1st September, 1814. Under the provisions of these acts, commissioners were appointed, who proceeded to make the required investigations, and to report to the Secretary of the Treasury, which reports were submitted to Congress.—See 3 vol. of the American State Papers, p. 6, et seq. These reports, though submit-

## JUNE TERM, 1851. 389

Hall et als. v. Doe ex dem. Root.

ted to Congress on the 2nd of January, 1816, do not appear to have been finally acted upon until the 3rd of March, 1819.

In the report made by William Crawford, who was the commissioner charged with the investigation of claims to land East of Pearl river, he designates the claims presented under appropriate heads, classifying them in twelve lists or registers, according to the nature of the claims, and the action had upon them.

One of these contained a register of claims founded on private conveyances, which had passed through the office of the commandant, but founded, as the claimants supposed, on grants lost by time or accident. This register comprised sixty-seven claims for different quantities of land, and the opinion of the said commissioner which accompanied the report was, that although the grants upon which these claims were founded were lost, yet he conceived that the claims to such lands, not exceeding a reasonable quantity, as were inhabited and cultivated under the Spanish government, ought to be confirmed.

By the second section of the act of 1819, all claims reported as aforesaid in the several reports of the commissioners, founded on any order of survey, *requette*, permission to settle, or any written evidence of claim, derived from the Spanish authorities, which ought in the opinion of the commissioners to be confirmed, and which by the said reports appear to have been derived from the Spanish governments before the 20th day of December, 1803, and the land claimed to have been cultivated and inhabited on or before that day, shall be confirmed in the same manner as if the title had been completed; provided, that in all such claims where the plat and certificate of survey made prior to the 15th April, 1813, under the authority of the Spanish government, in pursuance of such claim, has not been filed with such commissioners, such claim shall not be confirmed to any one person for more than twelve hundred and eighty acres; and that for all other claims to land comprised in the reports aforesaid, and which ought in the opinion of the commissioner to be confirmed, the claimant to such land shall be entitled to a grant therefor, as a donation. This grant, however, was not to be made to any one person for more than 1280 acres, and these confirmations and grants were to operate only as a relinquishment by the government forever, on the part of the United States, of any claim whatever to the tract of land so confirmed or granted.

Hall et als. v. Doe ex dem. Root.

One of the alleged titles set up by the plaintiffs in error in the Circuit Court, was reported upon by the commissioner in the report made in 1816, and the same is embraced in the register of claims, founded on private conveyances which have passed through the office of the commandant above referred to. The claim is thus stated in the report, "number of claim, 51; by whom claimed, Daniel Johnson; original claimant, John Lynder; where situated, Mobile Bay; quantity claimed, 5,000 arpens; cultivation and inhabitation, formerly inhabited and cultivated by Lynder. The date of the bill of sale to Johnson appears to have been altered."—3 vol. State Papers, 31.

The other claim set up by the said plaintiffs in error, founded on a title derived from the Spanish Government by Mad. De Lusser, and the several mesne conveyances to Mr. Hall, are attempted to be sustained independent of any action on the part of the government of the United States. Neither the alleged grant and certificates of title and possession given by the Spanish authorities to Mad. De Lusser, nor the mesne conveyances, were presented either to the commissioner of land claims, or to the register and receiver of the land office at Jackson court house, (who, under the provisions of the eighth section of the act of 1819, succeeded to the powers and duties previously devolved upon the commissioners,) to be entered of record; as required by the acts previously noticed.

By the seventh section of the act of 1819, persons who had filed notices with the commissioner according to the former laws upon the subject, but who had not exhibited sufficient evidence in support of them, and whose claims had not been confirmed, were allowed to deliver other evidence by the first of July, 1820, which evidence was required to be recorded as under the previous acts.

Under this last act, it appears that Thomas Byrne made known his claim before the register and receiver, acting as land commissioners at Jackson court house, and the same is embraced in their report upon the "register of claims to land in the district east of Pearl river, in Louisiana, founded on orders of survey, (requetts) permissions to settle, or other written evidence of claim, derived from either the French, British or Spanish authorities, which in the opinion of the register and receiver ought to be confirmed." The claim is thus stated in the abstract or

register, number 2: "Number of claim, 3; by whom claimed, Thomas Byrne; original claimant, Cornelius Dunn; nature of claim, and from what authority derived, Spanish government; date of claim, 17th September, 1796; quantity claimed, unknown; where situated, Potatoe bayou; by whom issued, Peter Oliver; cultivation and inhabitation, from 1793 to 1804."—3 vol. Am. State Papers, 395. Notice of this claim was first filed before the commissioner Crawford by Thomas Dunn, on the 25th day of June, 1813, but it does not appear that any action was had upon it, under the claim asserted by Thomas, as the son of Cornelius Dunn, who had died. The notice of Byrne claims the land as the son-in-law of Cornelius Dunn, under a permit from Don Pedro Oliver, a Spanish commandant of the town and district of Mobile, " to establish a cow pen upon the southern bank of the bayou, called Potatoe, on the east border of the river Tensas, carrying said cow range at least three miles above said bayou, reckoning to be from its mouth in ascending it." This permit and the evidence in support of it appear to have been duly recorded.

The report of the register and receiver upon the claim of said Thomas Byrne, was confirmed by Congress, by the second section of the act of 1822, " in the same manner as if the title had been complete," such confirmation, however, to amount only to a relinquishment forever of all claim on the part of the United States.—Story's L. U. S. 1868. And by the fourth section of the same act, the said register and receiver were invested with power to direct the manner in which such lands should be located and surveyed, having regard to the laws, usages, and customs of the Spanish government on that subject; and in cases of interfering or conflicting claims, said officers had power to decide between the parties, and were required to be governed in their decision by such conditional lines or boundaries as may have been agreed on, either verbally or in writing, at any time before the passage of the act, between the parties. The same act further provides that, in cases of conflicting or interfering claims, where the parties interested have agreed on no conditional lines or boundaries as to the manner of locating the same, the register and receiver of the district shall make an equal division of the land claimed, so as to allow each party his or their improvements, but this was not to be done in favor of an intru-

der who had made his establishment after having been forbidden to do so.

Under this provision of the act of 1822, the register and receiver proceeded to direct the location of Thomas Byrne's claim, which was surveyed and located accordingly, and a patent issued therefor, embracing the law described in the declaration, upon their certificate of confirmation, and plat of the survey filed in the general land office. This patent purports to be but a quit claim of the United States to Thomas Byrne, in right of Cornelius Dann, subject to any just claim or claims to all and every part thereof, of all and every person or persons, bodies politic or corporate, derived from the United States, or from either the British, French or Spanish authorities. The deed of Thomas Byrne and wife to the lessor of the plaintiff, Chester Root, was duly proved.

This constitutes a summary of the legislation of Congress upon the subject of these lands, and the action of the officers of the general government, in relation to the titles which are set up in the record before us.

In respect to the title set up, as derived from the Spanish authorities to Maj. De Lusser, and the evidence of that title, and of the mesne conveyances, &c., connecting the plaintiffs in error therewith, we are of opinion, that inasmuch as they were never presented to the board of commissioners as required by the several acts to which we have referred, they were improperly received as evidence, and could not operate to defeat a title derived from the United States. Not having been recorded, as provided for by these acts, they cannot "ever after be considered or admitted as evidence in any court of the United States, against any grant thereafter to be derived from the United States." In Strother v. Lucas, 12 Peters, 410-448, Mr. Justice Baldwin, in speaking of the various acts limiting the time for filing claims before the commissioners, said, "These are laws analogous to acts of limitations, for recording deeds, or giving effect to the award of commissioners for settling claims to land under the laws of the States; the time and manner of their operation, and exceptions to them, depend on the sound discretion of the Legislature, according to the nature of the titles, the situation of the country, and the emergency which calls for their enactment. Reasons of sound policy have led to the general

Hall et als. v. Doe ex dem. Root.

adoption of laws of both descriptions, and their validity cannot be questioned." It may be said of such claims as these, as was remarked by Chief Justice Marshall in Henderson v. Poindexter's Lessee, 12 Wheat, 543, when speaking of a failure to present a claim as required by the act of 3rd March, 1803, and the supplemental act of March 1804, "claimants," said he, "could not complain, if the law which gave validity to their claims, should also provide a board to examine their fairness, and should make their validity depend on their being laid before that board. The plaintiff in error has failed to bring his case before the tribunal, which the Legislature had provided for its examination, and has therefore not brought himself within the law." In the case before us, however, it is insisted that the certificates or recognition of title by the Spanish and French authorities to Madame De Lusser, gave her a complete title, which needed no confirmation by the United States to give it validity, and that it was not therefore necessary for those claiming under her to present the claim or evidences of title to the land commissioners to be recorded. It will be observed that the language of the act requiring this to be done is general, and embraces all grants either from the British, French or Spanish governments, whether complete or inchoate, providing in cases of complete grants, that the grant itself, together with the order of survey and plat, shall be recorded, and that the mesne conveyances may be abbreviated; "but the claim of title and the date of every transfer shall appear on the record." It is true, the act does not say, as some of the previous acts had said in reference to other portions of the territory acquired by the treaty of Paris, that the right of the person failing to file the evidences of his claim, &c., shall become void, or shall be ever after barred; but as against any grant which may be derived thereafter from the United States, the grant, order of survey and conveyances, which the claimant fails to deliver for the purpose of being recorded, become wholly inoperative, inasmuch as they cannot be considered or admitted as evidence in any court of the United States.

I have seen no case which questions the authority of Congress to pass such statutes as the one above referred to. It was certainly of the last importance to the repose of society, and the security of titles, that such measures should be adopted as would

26

394

ALABAMA.

Hall et als. v. Doe ex dem. Root.

enable the government of the United States to determine what land was subject to its disposal. It was further, as I conceive, the obvious duty of the government of the United States to require of persons claiming to hold under the governments which previously owned this country, to make known in some appropriate manner the nature and extent of their claims, so that the occupants of the county might have the means of ascertaining who were the proprietors, and of avoiding conflicts, as well as of protecting their improvements and possession against dormant titles.—In Bagnell, et al. v. Broderick, 13 Peter's R. 450, it was said that " Congress has the sole power to declare the dignity and effect of titles emanating from the United States;" and it has virtually declared that its grant shall prevail over a claim of the character of Mad. De Lusser's, the evidence of which has never been delivered to the appropriate offices for record. And we may safely conclude, that, if persons holding grants from the ceding governments chose to withhold from being recorded the evidences of them, and of the mesne conveyances, they elected to submit to the alternative imposed by the act of Congress, and to have them rendered impotent as evidence when opposed by a title derived from the United States.

But it is objected that the title set up by the plaintiff below was not derived from the United States, but that he holds under the Spanish concession to Cornelius Dunn, which Congress has confirmed, and that therefore, the act which declares the unrecorded evidences of grants, conveyances, &c., shall not be admitted or considered, &c., does not apply. We have anticipated this objection by the proposition stated in the outset of this opinion, that in such cases, the government must be regarded as the source of title. The Spanish permit given to Dunn, to establish a cow pen on the Southern bank of Potatoe Bayou on the Eastern border of the river Tensas, carrying said cow range at least three miles above said bayou, reckoning to be from its mouth in ascending it, did not give him a title, but the permission upon its face proposed " that in the mean time he could obtain the corresponding title from the general government, after giving the proper information thereon." This permission was never perfected into a title under the Spanish government, but after the cession to the United States, constituting as it did rather an appeal to the bounty, than a demand upon the justice of

Hall et als. v. Doe ex dem. Root.

this government, it was confirmed as if the title had been complete; was located and surveyed, and a patent issued for the same. The patent is qualified, it is true, but still it operates to pass the title from the United States to the person to whom it is given, and being thus operative, must be regarded a grant from the government, and the act of Congress which forbids that the evidence of unrecorded grants from the ceding governments shall be admitted or received against it in any court of the United States applies to it.

Had the unrecorded evidence of a grant and mesne conveyances been introduced to show an adverse possession under color of title, so as to protect the party in possession under the statute of limitations, then they would have been properly allowed.— *Doe. ex dem.* Farmer's heirs v. Eslava, 11 Ala. R. 1042; and same case, 9 How. R. *supra.* But such is not the effort in the case before us; the attempt is to make them operative as title papers to defeat the patent from the government of the United States.

The De Lusser claim aside, we proceed to examine the other set up by the defendants below. This was founded, as the claimant alleged, on a Spanish grant lost by time or accident, given to John Linder, sen'r., by him bequeathed to his son, John Linder, jr., and by him sold in 1803, to Daniel Johnson, with whom the tenant in possession connects himself by irrevocable power of attorney.

The first inquiry respecting this claim is, has it ever been confirmed ? The report of the commissioner, it will be remembered, which was made upon this and similarly situated claims, recommended for confirmation such of the claims for land as had been inhabited and cultivated under the Spanish government. The report says, this land was formerly inhabited and cultivated by Linder, but when it was so inhabited or cultivated, does not appear either by the report or the evidence taken before the commissioner. We cannot then, without doing violence to the report, consider this one of the claims recommended for confirmation. But if we were to regard it as recommended for confirmation, why then, it is only confirmed "for a reasonable quantity," which the act of confirmation says, shall not exceed 1280 acres, and no location or survey has ever been made in accordance with the statutes above cited. So that in any light in

which we can view this claim, we think we should be wholly un-authorized to give it the effect of defeating the claim of the plain-tiff, which, as we have said, is founded on the Spanish conces-sion, presented to the commissioner, reported for confirmation by him, confirmed by the act of 1822, located and surveyed under the warrant of the register and receiver, and consummated by the evidence of the patent from the government.

But it is insisted by the counsel for the plaintiffs in error, that conceding the defendants below showed no title, yet the title shown by the plaintiff was not sufficient to maintain the action; and he makes several objections to it, all of which seek to go be-hind the confirmation and patent. Now it is true, that where two claims to the same land are both confirmed by the govern-ment, as in the case of *Doe ex dem.* heirs of *Farmer v. Es-lava, supra,* the parties are remitted to their rights derived from the former government; the effect of the confirmation be-ing to place each party in *equali jure,* so far as the action of the government was concerned. Hence, the effort in that case to show the better title derived under the former government. But such is not the case here. We have shown that the claims set up by the defendants below cannot be required; and the question then comes up, whether the land in controversy belongs to the plaintiff, or to the government of the United States, which must be regarded the owner of the fee, unless it be shown that the same has been divested in some way. What is the effect of a confirmation of these incomplete or inchoate titles?—In Es-lava v. Doe, 7 Ala. 543, it is said "that the design of the various acts of Congress, confirming incomplete titles to land in Flori-da, it would seem, was not to legislate upon the title, but, by the disavowal of title in the United States, to remove all ob-stacles to the settlement of controversies relating to the title by the judicial tribunals." We do not understand our predeces-sors, in the opinion from which we have extracted a portion of the first head note, to decide that the confirmation, location and survey, and the patent issued thereon, do not operate to vest the person in whose favor the confirmation was had with a title which will maintain an action against one who can show no title, or that the patent is wholly inoperative to convey a title from the United States, if the United States at the time had any. They say the confirmation amounts to "an admission by the

Hall et als. v. Doe ex dem. Root.

government, that the land so confirmed is private property, and is not a part of the public domain;" that "it is not, and was not intended to be a guaranty of the validity of the title so confirmed, except as against the government," &c. Now we agree that it was not intended to confer on the confirmee any rights as against other claimants to the land, for these rights are expressly reserved; but as against the United States, there can be no doubt that the title passes, whether by way of estoppel, or by the operation of the confirmation, and the patent issued in accordance therewith as a conveyanc , makes no difference ; and the government having said by its solemn act, that the land belonged to Thomas Byrne, in right of Cornelius Dunn, it is not for a stranger to say, that the conveyance is informal, or that the government has been imposed on, or that the survey and patent embrace land not covered by the original claim. Much less is it allowable to say that the confirmation should not operate in favor of the confirmee, because of some defect in the mesne conveyances from the original claimant to such confirmee. In the aspect in which we are considering this case, all these are questions between the plaintiff below and the government, and the persons whose rights are supposed to have been affected, which the defendants, being strangers, have no interest in. We say they are strangers, because the claim of Linder not having been confirmed, and failing to show any original grant to him, which can have the effect of severing the *locus in quo* from the public domain, they have no standing in court as against the title exhibited by the plaintiff below.

In Strother v. Lucas, 12 Peters, 458, it was insisted, that the only objects of the acts of Congress being to ascertain what property had been acquired by individuals before the cession, the commissioners were to act only on original claims, and by confirming the rights of the original owner, to leave the derivative right under him entirely open between adverse claimants. The court, however, held, that this view of the case could not be sustained, and said, that it was inconsistent with all the acts of Congress which have organized boards of commissioners for adjusting land titles, the proceedings of the board, and the laws which have confirmed them ; that it would defeat the whole object of these laws, and introduce infinite public mischief, to hold that the confirmations by the commissioners and Congress, made

expressly to those who claim by derivative titles, did not operate to their own use.

We believe that we have now considered all the questions raised by the charges which were given, and those which were prayed for but refused, and without prolonging this opinion, already too prolix, by an application of them to each charge, we conclude by saying that the Circuit Court committed no error, which was prejudicial to the defendants below.