KENNEDY'S EX'R *vs.* Doe ex dem. ROCHON'S HEIRS.

1.  Evidence cannot be received in the appellate court to contradict the record in the primary court; nor will this court, on error, look to the American State Papers, as published under the authority of Congress, to show a mistake in the certified copy of a public document contained in the transcript.
2.  The act of Congress of May 8, 1822, (3 U. S. Stat. 699, 700,) "confirming claims to lots in Mobile," &c., confirms only those claims "which, in the opinion of the commissioner, ought to be confirmed"; and the commissioner's report, on which the act is based, only recommends for confirmation, of all the claims embraced in register No. 11, "the claims to such lots as were inhabited and cultivated under the Spanish Government, or such as were built upon by permission of the Spanish authorities." Therefore a claim to a lot which was inhabited and cultivated by one of the claimant's ancestors while Mobile was under the dominion of Great Britain, though included in the commissioner's report, does not come within the provisions of the act of confirmation, when it is shown that the mansion-house, with all the improvements, was burned down during the siege of Mobile by the Spaniards in 1780, and there is no proof of any subsequent inhabitation or cultivation under Spain.
    (This applies to the claims of the heirs of A. Rochon, numbered 74, 75 and 76, in the register (No. 11) of claims "founded on private conveyances, which have passed through the office of the commandant, but which are founded, as the claimant supposes, on grants lost by time or accident."— See Commissioner Crawford's Report, in 3d vol. Amer State Papers, p. 32.)
3.  The case of Doe *ex dem.* Farmer's Heirs v. Eslava, reported in 9th How. U S. Rep. 421, in which a similar claim was held to be within the act of confirmation, cannot be regarded as a judicial determination of the point presented in this case, since no question was there raised as to the fact of confirmation.

ERROR from the Circuit Court of Mobile.
Tried before the Hon. LYMAN GIBBONS.

EJECTMENT for a lot of land situated in the city of Mobile, and described as follows : " Beginning at the south-east corner or intersection of Conception and Government streets ; containing one hundred and fifty-six feet front on said Government street, by a depth of forty feet, more or less, on Conception street ; bounded north by Government street, east by the property of ———, and south by the property of the heirs of Rochon."

The action was commenced in June, 1849, and a trial was had in May, 1852, which resulted in a verdict for the plaintiffs. The plaintiffs claimed as heirs-at-law of Augustin Rochon, deceased, whose title, as they insisted, was confirmed by the act of Congress of May 8, 1822, " confirming claims to lots in the city of Mobile"; while the defendant, as the executor of Joshua Kennedy, deceased, derived title under a Spanish concession to Thomas Price in 1798, which was confirmed by the act of Congress of March 2, 1829, and a patent issued to Kennedy in 1837.

The defendant's bill of exceptions states, that " the plaintiffs gave in evidence duly certified transcripts from the land-office at St. Stephens, Ala., showing the application of said Rochon, the proceedings in the land-office, the report of Commissioner Crawford on the claim, and also the survey of said lot as certified ; copies of all which documentary proofs of title are hereto annexed in schedule A, and made a part of this bill of exceptions." The several documents set out in the transcript are correctly and particularly described in the opinion of the court ; but there is no " schedule A" in the record, and nothing by which these documents can be identified with those referred to in the bill of exceptions.

The bill of exceptions further states, that " the defendants gave in evidence a patent issued to Joshua Kennedy, in right of Thomas Price ; also, the record of the proceedings in the land-office showing the applications for confirmation of said title of Price, maps, surveys, reports, &c., as set forth in schedule B, hereto annexed as a part of this bill of exceptions. The defendant gave in evidence, also, the mesne convey-

ances from Price to Joshua Kennedy; the death of Kennedy in 1838 ; his will, and the devise of the land to Hallett as his executor. The original Spanish concession, and the plat thereto attached, were also given in. evidence ; and it appeared in evidence, also, that the lot sued for was embraced within the said Price title, and within the portion covered by the first concession to Price." None of the documents here referred to as constituting the defendant's title are transcribed in the record, but there is an agreement of record, signed by the counsel of the respective parties, in these words :

" In this case it is agreed, that the record, plats, and documents constituting the Price title, with the certificates, plats, and evidences thereof, as found of record in the case of Doe ex dem. Hunt, Hogan, and others, against Hallett & Walker, reported in 7th Ala. Rep. 882, in this court, is made a part of this record, and may be referred to as part of it, with the reports thereof found in the public documents of the United States, (Amer. State Papers, tit. Public Lands, vols. 3 and 5,) the same being the Price title referred to in the bill of exceptions, and intended to be added to this record by consent, and now done."

The bill of exceptions states, also, that " it further appeared in evidence that the land sued for was fenced in by the United States, and taken possession of by its officers, at the time the Government took possession of Fort Charlotte, and it was held by the United States officers, enclosed as aforesaid, until about the time when the Fort-Charlotte lots were sold ; when this portion, and the lots around it, were thrown out, as not appertaining to the Fort-Charlotte lots. It was further proved, that Mr. Acre then set up some claim to it for the heirs of Rochon, and Mr. A. W. Gordon, claiming that he had made an agreement with Mr. Acre to purchase the rights he represented, entered upon the possession of the lot now sued for and the adjoining lots east and south of it ; but that the lot now sued for was afterwards claimed by the heirs of one Espejo as belonging to them, and Mr. Gordon gave it up to them, and took possession of the other portions. The heirs of Espejo thus got it, enclosed it, and held it. Mr. Gordon held the other portions for some time, till they got into other hands by his deed ; and finally, in 1837, the parties holding

the other portions of the Rochon claim (being the lot south of the lot sued for) purchased the title and claim of the heirs of Rochon, being ,for the part shown in the plat south of the lot sued for,, and exclusive of it. The heirs of Espejo remained in possession of the lot sued for, and Joshua Kennedy sued to obtain the possession from the tenant of Espejo; and it was surrendered by the heirs of Espejo to Hallett in 1842, upon his paying them certain sums paid to the corporation for making side-walks, &c., for which the corporation had given a title to said Espejo ; and thus the said defendant obtained the possession. It appeared that Kennedy, and those under whom he claimed, had possession of the lands of the Price title in Spanish times, and before confirmation, but no actual possession of this part. There was no proof where the lot of (the name is illegible, but supposed to be *Le Fleaux*; was ; nor was any evidence given to locate the lot of Rochon, other than the survey by the United States, and the claim by Acre as aforesaid, and the sale by them of the adjoining portions, and the assertion of claim in their conveyance to it, and by offers to sell it at public auction."

"Upon this evidence, the defendant asked the court to instruct the jury—

"1. That the patent to Kennedy, and the confirmation of title by the United States location and survey of the said lands conceded to Price, gave to said Kennedy and those claiming under him a good title to the land so patented.

"2. That the act of 1822, of itself, gave no vested title to Rochon or his heirs.

"3. That no title could, under said act, vest in said Rochon or his heirs, until a location of the lot so confirmed to them was made or approved by the officers of the land-office, ascertaining the location and boundaries of the lot.

"4. That the survey shown and approved by the surveyor-general was not, of itself, sufficient to locate the said lot, as against the defendant's location evidenced by the patent.

"5. That before the survey so shown could prevail over the patent of the defendant, it must be shown to have been adopted, sanctioned, or approved by the register and receiver of the land-office, and that no title could vest in the plaintiffs until such sanction was given by the land-officers.

"6. That the documentary title exhibited by the plaintiffs could not be sustained, because not in conformity with the requirements of the act of 1822, being for a quantity exceeding the limit of 7,200 square feet.

"7. That the claim of Rochon could not, under the act of 1822, be divided into more than one confirmation, so as to give more than 7,200 square feet to the claimants in the shape of two or more lots; and that if they had already obtained the double lot, they could not claim more under said act.

"8. That the record of confirmation was not sufficient evidence of title, the plaintiffs having produced no certificate of confirmation and no patent certificate.

The court refused these charges, and instructed the jury—

"That it was true that the title of the defendant, as shown by the patent, would, if taken by itself, give a good title to the grantees thereof; but that, as against the title shown by the plaintiffs, it would not: that the confirmation of the plaintiffs' title being in 1822, and prior in point of time to Kennedy's, it gave the better title; because, when the confirmation to Kennedy was made, it had no longer any title to grant, and because plaintiffs' title was within the exception of the patent to Kennedy."

"That the act of 1822 did vest a title in the heirs of Rochon to a lot, wherever such a one as described in the application could be found; and when so found, it attached to it, and the title related back to the date of the act."

"That if the lots described in the deed submitted to the commissioner can be ascertained by the jury from the evidence, and they comprehend the *locus in quo*, then the plaintiffs would be entitle to recover : that to ascertain the location of this lot, the survey of the United States officer was competent evidence, but it was not conclusive evidence against the defendants, and the latter might impeach or contradict it; and that if this survey offered by plaintiffs was the true location of the lot, then the title exhibited by plaintiffs to the lot was superior to that of defendant, and would entitle the former to recover."

The defendant excepted to the several charges given, and to the refusals to charge as requested; and he now assigns these rulings of the court for error.

GEO. N. STEWART and WM. G. JONES, for the appellant:

The whole question to be examined turns on the validity of Rochon's title, and not on that of Kennedy. Rochon's heirs, it is conceded, show no title either under Spain or Great Britain: their claim is on the bounty of the United States merely. They claimed that their ancestor had a possession under Great Britain, but they claimed no possession or title under Spain. The acts of Congress, under which these claims were presented before Commissioner Crawford, allowed every description of claim to be laid before him. He passed on them, and divided them into classes, in which shape he reported on them; and the Rochon claim falls within the class numbered 11, the list of which is headed "Register of claims to lands in the district east of Pearl river in Louisiana, founded on private conveyances which have passed through the office of the commandant, but founded, as the claimant supposes, on grants lost by time or accident."—American State Papers, vol. 3, p. 32. The act of May 8, 1822, acted upon all these different classes of cases; and a title by grant is now claimed by Rochon's heirs by the force and effect of the third section of that act, which disposes of that class of cases, and, as they say, vests a title in them by the law itself, without any further act being required to complete it. We deny that the act of 1822 does confirm this title to them at all, and insist that, consequently, they have no title.

To determine whether the Rochon claim was confirmed or not, we must carefully examine the act of 1822, and the report of Commissioner Crawford on that claim; and for further certainty we may look to the claim itself as presented, and the proof relied on to support it before the commissioner. It was on this claim and proof that the commissioner acted, and it was on his report that Congress acted.

The act of 1822 (§ 3) does confirm many claims where no title was produced; but they were confirmed in consideration of the possession which the parties had under Spain; and no claim was confirmed unless the commissioner had reported that, "*in his opinion*," it was entitled to confirmation. The language of the section is, "that all claims," &c., "which have passed through the office of the commandant, but founded, as the claimants allege, on grants lost by time or accident, *and*

*which ought, in the opinion of the commissioner, to be confirmed, shall be confirmed,"* &c. The act, then, is conclusive on this point; and the commissioner's decision, that the claim is entitled to confirmation, is indispensable.

Let us now examine what the claim of Rochon's heirs was. Their petition to the commissioner is dated April 25, 1814; and by it they claim three lots of ground, by virtue of a grant lost by time or accident, made in favor of B. F. Fievre, and transferred to A. Rochon by bill of sale dated February 2, 1775. Next follows a copy of an English deed, from divers persons, to Augustin Rochon, of the above date, in the 15th year of the reign of Geo. III., for one double lot and one single lot. Next is a translated copy of a will, originally in French, made by Louise Fievre, dated July 6, 1805, and reciting that she was the widow of Rochon, and that she owned some lots—two with a house on Royal street, and five others in the environs of the fort—which she bought of different persons in the time of the French and English Government; and declaring that her children have already received the property of their father. We next find the depositions of two witnesses, Bart. Lorent and Wm. Mitchell, made the 21st April, 1814. Lorent deposes, that Mad. Rochon, at the time the Spaniards came to take the fort of Mobile, lived in her house built on her lots nigh the fort; that the English burned her house, with all her improvements; that he does not perfectly recollect the number of lots she possessed, but thinks there ought to be nearly five from the extent of them, as she had upon them a large yard, a large garden with fruit trees, and a park; that the lots were bounded on the north by the lots of the deceased John Baptiste Le Fleaux and the street, to the south by the common, and to the east and west by the streets, the lots traversing the square from west to east. Mitchell deposes, that when the Spanish came to take the fort of Mobile, in 1780, Mad. Rochon lived in her house built on the lots she had nigh the fort and facing the common; that during the siege of the fort the English put fire to her house, which was burnt with all the other improvements; that he does not perfectly recollect the quantity she possessed, but that she had on said lot a large court, a large garden with fruit trees, and a park; that these lots were bounded on the

north by the lot of the deceased John Baptiste Le Fleaux and the street, to the south by the common, and to the east and west by the streets, her lots traversing the square from east to west. This was all the evidence laid before the commissioner, and that on which he founded his report.

The commissioner made his report on the 20th October, 1814, and it was laid before Congress in 1816 by the commissioner of the General Land-Office, R. J. Meigs.—Amer. State Papers relating to the Public Lands, vol. 3, pp. 31, 32. In some of the registers the commissioner recommends the entire list of claims as in his opinion entitled to confirmation, and in others he reports the entire list as not entitled to be confirmed; but the list numbered 11, which comprehends this claim, does not in the heading profess to set forth his opinion. This list contains eighty-eight claims, and the commissioner sets out, in tabular form, the special facts ascertained by him in each case, which he deems material. The Rochon claim we find split up into three, each for one lot, numbered 74, 75 and 76, and as to them the facts found are as follows: "By whom claimed—Heirs of Rochon; Quantity claimed— Unknown; Where situated—Mobile; Inhabitation and cultivation—Inhabited and cultivated about 36 years ago." His report, at the bottom of the list, is, "That the claims to such lots as were inhabited and cultivated under the Spanish Government, or such as were built upon by permission of the Spanish authorities, ought to be confirmed." We must, therefore, to ascertain the effect of this report on each claim, apply these remarks to each case separately on the list; and by so doing, we will find the effect to be, that he reports seventy-one cases as in his opinion entitled to confirmation, and seventeen cases not so entitled, and among the latter is the case of Rochon. In every case, he reports, as was made his duty by the act of 1812 under which he was appointed, (Clarke's Land Laws, p. 608, § 5,) on the inhabitation and cultivation by the parties, and when; and in Rochon's case, he reports, not a possession under Spain, but, in effect, a possession *about thirty-six years ago."* It must be here noticed, that there is an error, or misprint, in the published copy of the commissioner's report, which makes it say "Inhabited and cultivated *about thirty-six years,"* instead of *"thirty-six years ago":* the

certified copy of the record from the Land-Office shows the true report, and the evidence laid before the commissioner, which shows when the possession was, confirms it. The report being made in 1814, the period of the possession, "*thirty-six years ago,*" carries us back to the year 1778, when, as history informs us, Mobile was a British possession. It was taken from England, by assault by the Spanish troops, in 1781, and became a province of Spain in 1783, by the treaty of peace between England and Spain.—See Pickett's History of Alabama. It is clear, therefore, that when the report shows a possession in 1778, none being pretended since that time, it cannot be taken as in the opinion of the commissioner entitled to confirmation, since he determines that only those who possessed under Spain, or those who built on land by Spanish authority, are so entitled.

It cannot be pretended that the commissioner's report meant anything else than we have shown. The report is the correct result of the proof laid before him; and there was no proof of any possession under Spain, and no pretence of any in the petition. How could the commissioner report, or intend to report, a possession under Spain, when none was proved, nor pretended? The title was confessedly a British one, if any ever existed. The commissioner well knew that Spain claimed forfeitures of such titles, and had the right to re-grant the lands; and hence his requirement of either a Spanish occupation or a concession by Spain. How can this claim be distinguished from No. 87 in the same list, where the report was, "Inhabited while the British possessed West Florida"? It cannot be pretended that the commissioner reported in favor of that claim; yet Rochon's is, in effect, precisely a similar case: in neither one of them was there a possession under Spain. We all know that, by the treaty between Spain and England, British subjects were entitled to a certain time to sell their possessions; and that, if they did not do so, their possessions were forfeited, and subject to be re-granted to others by Spain.—Doe *ex dem.* Farmer's Heirs v. Eslava, 11 Ala. 1028, (a case similar to this).

But we are not left to doubt on the question whether this is a confirmed title or not: it has been fully and expressly decided by this court in the case of Hall v. Root, 19 Ala. 392.

In that case, it was the claim of Daniel Johnson, (original claimant, John Lynder,) for 5,000 arpens ; and the report of the commissioner was, " Formerly inhabited and cultivated by Lynder ; the date of the bill of sale to Johnson altered." It did appear by that report that the land had been inhabited and cultivated, but the commissioner did not say when, nor that it was under Spain ; and in that case, as in this, he said, that those claims to lands which were cultivated and inhabited under the Spanish Government were, in his opinion, entitled to confirmation. But this court said, " We cannot, without violence to the report, consider this one of the claims recommended for confirmation."—p. 395. That case was not so clear a one as ours, and a decision against us here could not be made without overruling that case ; and yet that passage in the opinion is correct, and no one can doubt it. We insist, therefore, that this is a conclusive objection to the plaintiffs' action, and must defeat it, as the plaintiffs certainly have no confirmed title, and consequently no title whatever.

A. R. MANNING, P. WALKER, D. CHANDLER, and R. H. SMITH, *contra:*

The point particularly insisted on for appellant is this : That the commissioner Crawford by his report recommended for confirmation the claims to such lots only " as were inhabited or cultivated under the Spanish Government, or such as were built upon by permission of the Spanish authorities ; that the claim of Rochon's heirs did not come within this category; and that it was not therefore confirmed by section 3 of the act of 1822, confirming those claims " which ought in the opinion of the commissioner to be confirmed."

Supposing, for the present, that there was any reason for extending the bounty of the Government, or its justice, to claimants under one of the sovereigns which preceded it in its jurisdiction over the country about Mobile, rather than to the claimants under the others, and that it intended to do so ; what was the opinion or report of the commissioner Crawford, in reference to the claims of the appellees, on which Congress acted?

We are seeking to get at the meaning of an act of Congress. For a right interpretation of it we must examine the reports

to which it refers in the body of it, and upon which it is predicated. It was enacted to quiet titles in favor of those who were supposed by Congress to be justly entitled to such relief against it. The claimants and the friends of each, in and out of Congress, observe the acts of that body, and the reports referred to therein ; and if, according to these solemn and open documents, their claims respectively are recognized and confirmed, of course, they rest content. The Government thereby says to them, in effect : Trouble yourselves no more ; though there be other evidence which you may procure, before witnesses die, or archives shall be removed or destroyed, make no efforts to secure and save such evidence ; here is the confirmation of your title. To suffer such confirmation to be defeated, twenty or fifty years afterwards, by an allegation that a public officer had made a mistake in the report upon which Congress acted, would be but to set a trap to divest innocent and meritorious citizens of what might be their just rights.

What, then, was the report on which Congress acted in reference to this claim, and which became a part of the statute by express reference in it? Appellant's counsel says, it was one in which the commissioner, in October, 1814, reported that the lot claimed was " inhabited and cultivated about thirty-six years ago ", at which time the Spanish King had no dominion in the country. We say, for the appellees, this is not so. True, the register of the land-office at St. Stephens, in a paper from that office, certifies to a transcript of a writing purporting to be Crawford's report, in which the word "ago" appears. But this is not the report itself, upon which Congress acted, to which it referred, and to which the claimants and others must have looked for the ascertainment of the expressed "opinion" of the commissioner. That report the commissioner was at first required (by the act of April 25th, 1812, § 7, 2 U. S. Stat. at Large 713) to make to the Secretary of the Treasury ; but afterwards, and before Crawford reported, he was required to make it to the Commissioner of the General Land-Office. This Crawford did ; and that officer (R. J. Meigs) in 1816, communicated the report to Congress. It is found as public document " No. 234, 14th Congress, 1st session, (from pages 6 to 36,) in the 3d volume of "American State Papers" relating to public lands,—declared in the title-

page to be "Documents Legislative and Executive of the Con- . gress of the United States", "Selected and edited under the authority of Congress, by Walter Lowrie, Secretary of the Senate, and Walter S. Franklin, Clerk of the House of Representatives." On page 36 is the report of the claim of Rochon's heirs. ` Mr. Stewart, in his printed argument, (p. 5,) refers to the same, though he sinks the most important part of it in a note at the bottom of his page.

By this report, then, upon which Congress acted, (and which by adoption or express reference became a part of its statute,) the commissioner Crawford reported that the lot claimed had been "inhabited and cultivated about thirty-six years." And as, during the greater part of the thirty-six years before 1814, Mobile was under Spanish rule, this claim came plainly and expressly within the recommendation of the commissioner. Whether there was an error or not in the report, it is needless to inquire. If there were, and the plaintiffs' own evidence show it, still it does not defeat the confirmation. The affidavits, writings, and other evidence left by the commissioner in the local land-offices behind, are not the things to which Congress referred as expressing "the opinion" of the commissioner, but his report communicated to it ; and their effect upon the title does not depend upon the side which introduces them. These papers, though, themselves show that the premises were occupied when the Spaniards were in possession of the city of Mobile, and actually taking Fort Charlotte; and that the Spaniards did not disturb this possession, but the English troops.

Little room is there for doubt that if the title of the heirs of Rochon were not considered as settled by the act of 1822, Congress could have been constrained, by the representations that would have been made to it, to confirm it before or in the act by which it gratuitously relinquished the title of the United States in favor of the holders of the enormous Price claim (made to absorb upwards of 900 acres in the city of Mobile), which Commissioner Crawford reported in 1817 as a fraudulent one (see 3 Amer. State Papers, *supra*, p. 11), and which has been made to swallow up many others of far more merit : for the proof shows that the premises claimed by Rochon's heirs had been a long time occupied, improved and

claimed as private property, with a mansion, a park and an orchard upon it, right under the walls almost of old Fort Charlotte, the very seat of the power of the monarchs of France, England, and Spain, who successively had rule in Mobile. So long, indeed, had these lots been private property, that in the act of sale thereof from Bellaque, Fievre, and others, to A. Rochon in 1775, (twenty-three years before the initiation of the vast Price claim,) a house on them is spoken of as "almost rotten and falling to the ground"; and in 1780, the mansion of Madame Rochon (not the garden and orchard, which were doubtless still used afterwards) was destroyed by the English authorities, the better to enable them to defend the fort against the assault of the Spanish troops, who at that time captured it : all the city except the fort being at the time in possession of the Spaniards.

Doubtless the claimants supposed that this proof, showing how long the premises claimed had been recognized and notoriously used as private property, and that the house on it had been destroyed under such circumstances, was the strongest case they could present to a Government which had succeeded the English and Spanish authorities in their rights, and in whose action it was a fundamental principle that private property could not be taken for public use without due compensation therefor : and if they had learned from the report of the commissioner and the act of Congress, that their claim was not intended to be confirmed, additional proof could have been had of their right.

But suppose the report of the commissioner, upon which Congress acted, had contained the words "inhabited and cultivated *about* thirty-six years *ago*"; we may inquire whether he did not still intend to recommend this claim for confirmation. The officers of the land-office at Jackson, Mississippi— who were authorized by the act of 1822 to issue their warrants for the survey of the lots to which the titles were confirmed—evidently so understood the commissioner : for, in the very next year (1823) after the enactment of the law, they issued their warrants accordingly.

Next, the act authorizing the appointment of the commissioner (2 U. S. Stat. at L. 713) requires him to make "abstracts from the records of the claims, in which the claims

shall be arranged into classes according to their respective merits and other circumstances whereby they may be diversified"; and from the fourth section (p. 715) it appears that Congress did not consider titles derived from English or French authority any less worthy of favor than Spanish titles.

Again; the abstract containing this claim is headed "Register of claims", &c., "founded on private conveyances, which have passed through the office of the commandant", who was a Spanish official : from which we must infer that the commissioner intended to certify all these claims as having the sanction of the Spanish authorities, and all therefore entitled to confirmation, except such as ·he expressly reports (as he does of several) as never having been inhabited or cultivated at all, or not until after the country passed to the United States, by the treaty of 1803 with France.

This conclusion is strengthened by the fact, that in this abstract he does not in any line of it refer to the nationality, whether English, French, or Spanish, of the original grants, or inquire into it—they being lost; and knowing that the Spanish authorities had long and immediately preceded the United States in the occupation of the country, he probably never adverted to the fact, that thirty-six years before 1814 would go back to the last years of the English occupation and the first of the Spanish. The word "about", in the report, has a similar significance—"about thirty-six years", or "about thirty-six years ago."

There is not a particle of evidence justifying the suggestion that the Rochons or Fievres were British subjects, who might forfeit their rights of property under the treaty between Great Britain and Spain : and their names, the language they use in their wills, &c., clearly indicate that, if not Spanish subjects, they belonged to the class of French settlers, derived from the country with which Spain was at that period in close alliance against England.

NOTE BY REPORTER.—The arguments of the respective counsel on numerous other points presented by the record, which are not noticed in the opinion, are omitted for want of space, and because they are deemed unnecessary to a correct understanding of the points decided.

CHILTON, C. J.—As every plaintiff in ejectment must recover, if at all, upon the strength of his own title, our first inquiry will be, whether the heirs of Rochon exhibited such title in the court below as would support their action. If they failed to do so, and their failure results from an incurable defect, affirmatively shown by them in the proof which they submitted, it were needless for us to go further and discuss the other points raised in the argument.

They exhibited in the court below their petition to the commissioner, under date the 25th April, 1814, by which they claim three lots of ground in virtue of a grant, lost by time or accident, in favor of B. F. Fievre and transferred to A. Rochon by bill of sale dated 2d February, A. D. 1775. Then a deed from Frances Fievre, Martha Dubroca, and Louise A. Rochon, to Augustin Rochon, dated 2d February, 1775, for a double lot and a single lot of ground, situate in the town of Mobile, bounded by streets and the lots of coterminous proprietors as therein shown. Next a will, made by Louise Fievre, dated 6th July, 1805, reciting that she was the widow of A. Rochon, and that she owned certain lots,—two with a house on Royal street, and five others in the environs of the fort, which she purchased of different persons while the French and English governments held possession. In this will she also declares, that her children had already received the property of their father, agreeably to the writings which had been made at different epochs. Then follow two affidavits, one of Bartholomew Lorent, the other of William Mitchell, showing Madam Rochon's possession during the British times, and the destruction of her house and improvements pending the siege by the Spanish authorities in 1780.

The foregoing was the evidence laid before the commissioner Crawford, as shown by the certified transcript from the land-office, introduced by the plaintiffs below. In the same transcript is set forth the report of the commissioner upon the claims as above propounded before him. In this report, it is stated by the commissioner that the lots were "inhabited and cultivated about thirty-six years ago." These, with two surveys by Willis Roberts, deputy surveyor, and transcripts from the registers of certificates and locations, constitute the documentary evidence adduced by the plaintiffs.

Kennedy's Executor v. Doe ex dem. Rochon's Heirs.

1. The first prominent objection urged by the counsel for Mr. Hallett against Rochon's title, is, that it was never confirmed by the act of Congress of 8th May, 1822, (3 Statutes at Large of the U. States, pp. 699–700). Let us see whether this objection can be sustained.

The act provides, " That all claims to lots in the town aforesaid (Mobile), reported as aforesaid, and contained in the reports of the commissioner, or of the register and receiver acting as commissioners, founded on private conveyances, which have passed through the office of the commandant, or other evidence, but founded, as the claimants allege, on grants lost by time and accident, and which ought, in the opinion of the commissioner, to be confirmed, shall be confirmed, in the same manner as if the titles were in existence : *provided*, that in all such claims, where the quantity claimed is not ascertained, no one claim shall be confirmed for a quantity exceeding seven thousand two hundred square feet." 3 Statutes at Large, 699-700.

Among the reports referred to by this act of Congress, is one by Commissioner Crawford, embracing a class of claims, numbered 11, the list of which is thus headed :—" Register of claims to land in the district east of Pearl river in Louisiana, founded on private conveyances which passed through the office of the commandant, but founded, as the claimant supposes, on grants lost by time or accident." This schedule embraces eighty-eight claims, and comprehends the claims of the heirs of Rochon. It is made out in the following form :—

| Numbers. | By whom claimed. | Original claimant. | Quantity claimed in feet. | | | Where situate. | Cultivation and inhabitation. |
| | | | Front. | Depth. | Area. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 64 | A. Duplantier, | Sim. Andry, | 210 | 156 | 32760 | Mobile, | From 1805 to Nov. 1813. |
| 65 | M. B. Stewart, | J. F.-Franier, | 60 | 120 | 7200 | " | Not inhabited nor cultivated. |
| * | * | * | * | * | * | * | * |
| 74 | { Heirs of　A. Rochon, | Fievre, | Unknown, | | | " | { Inhabited & cultivated about　thirty-six years ago. |
| 75 | Same, | Same, | Do. | Do. | Do. | " | Do. |
| 76 | Same, | Same, | Do. | Do. | Do. | " | Do. |

The schedule is signed by the commissioner, and is accompanied by the following :—" Remarks—Though the original grants, upon which the preceding claims are founded, have been lost, yet it is conceived that the claims to such lots as

were inhabited and cultivated under the Spanish government, or such as were built upon by permission of the Spanish authorities, ought to be confirmed."—(Signed) "William Crawford, Commissioner."

We are referred by the counsel of the appellees to the 3d volume of the American State Papers, page 32, containing the report of Commissioner Crawford upon these and other claims, an extract from which report is set out in the bill of exceptions, being certified from the land-office, and which corresponds, as respects these claims, with the facts set forth in the above tabular statement.

In the American State Papers, however, the word "ago" is omitted, and if we are to be governed by the printed report, as contained in this volume, it is very clear, the claim of the heirs of Rochon must be regarded as confirmed ; for it appears by it, that the lots were inhabited and cultivated from a period anterior to the conquest of Mobile by the Spanish from the British Government down to the period of the making of his report by the commissioner. The printed report, as contained in this volume reads "Inhabited and cultivated about thirty-six years." We are, however, unable to perceive upon what principle we can receive evidence in this court to contradict the record in the court below, or to show a variance between the transcript of the report introduced by Rochon's heirs in the primary court as a part of their evidence of title, and the report as contained in the State Papers. We must intend, that the act of 8th May, 1822, was passed with reference to the original report made by Mr. Crawford, and not to the printed copy of it as contained in the American State Papers. Indeed, the act of Congress could not have been based upon the report as printed in this volume, for it was not printed until 1834, about twelve years after the act was passed. Although these State Papers, having been published by authority of Congress, are evidence of high grade, yet we apprehend that it cannot be successfully maintained that the rights of parties in respect of private claims can be affected by the misprints which they may contain. In our opinion, the misprint may be shown by reference to the original report on file in the government archives. It is, however, unnecessary to dwell upon this

point, as it was not raised in the court below. The plaintiffs, as we have said, by the certified copy from the land-office, showed to the court and jury upon the trial that the commissioner's report was, that the land was " cultivated and inhabited about thirty-six years ago"—that is, about thirty-six years before the making of his report; and as this corresponds fully with the evidence accompanying his report, we doubt not it is correct, and that the word " *ago*" is omitted through mistake in the printed report. We are inclined to the opinion, that the certified copy by the proper custodian of the report, as originally made by the commissioner, would control, and should be allowed to correct the printed report. See Marshall v. The State, 14 Ala. 411 ; also, 2 Salk. 566. But it is unnecessary now to decide that question.

Assuming the commissioner's report to be as was shown by the plaintiffs themselves in the court below, let us consider its effect, in connection with the act of 8th May, 1822, as to whether it amounts to a confirmation of plaintiffs' claim. This act of Congress is based upon the commissioner's report, and operates only as a confirmation of *such* claims as, *in the opinion of the commissioner*, expressed in his report, ought to be confirmed.

Turning to the report, in which are embraced the claims under consideration, we find none recommended by the commissioner for confirmation, except such lots as "*were inhabited and cultivated under the Spanish government, or such as were built upon by the permission of the Spanish authorities.*" Does this claim fall within this category ?

The report containing it was made by the commissioner to the General Land-Office on the 2d January, 1816. The lots were inhabited and cultivated about thirty-six years before that time. Was this a habitation and cultivation under the Spanish government? Our first impression was, that it should be so considered ; but upon more mature consideration, we are satisfied that impression was wrong. It is matter of public history that the Spanish took possession of Mobile, by conquest from Great Britain, on the 14th March, 1780, (2 Pickett's History of Alabama, p. 41 ; Martin's History of Louisiana, vol. 2, p. 52) ; and if we go back thirty-six years from the time the commissioner reported, we shall go beyond

the time when Mobile was taken from the English. When, however, we recur to the proof exhibited to the commissioner in support of the claim, and submitted by him to the government, it is perfectly clear that these lots were neither built upon, inhabited, nor cultivated under the Spanish government. The only witnesses examined, Lorent and Mitchell, both concur that the English put fire to the house of Madam Rochon, during the siege of the fort by the Spanish ; and it, "*with all her improvements,*' was burned ; since which time, there was no proof of inhabitation or cultivation under the Spanish government. When these improvements were destroyed, the English were in possession of the town ; the Spanish authority had not been established, or recognized.—Indeed it may well be questioned, whether the place could be said to be under the Spanish government until it was so recognized by the treaty of peace. Mr. Vattel says (p. 386) that "Immovable possessions, lands, towns, provinces, &c., become the property of the enemy who makes himself master of them ; but it is only by the treaty of peace, or the entire submission and extinction of the State to which those towns and provinces belonged, that the acquisition is completed, and the property becomes stable and perfect." But dating the Spanish rule from the capitulation of the fort, until which time the English certainly held the actual possession and government of it, it is clear the inhabitation and cultivation did not then exist. The improvements had been destroyed, and although their destruction may have been (and probably was) one of the results of war between England and Spain, yet, we apprehend, the United States did not intend, by the acts providing for confirmation of title, to make compensation for such casualties. If, during the siege, the inhabitants, then being subject to the government of Great Britain, had destroyed all their improvements, and abandoned the place to the enemy, or capitulated, and had never re-possessed themselves of their respective lots—had never re-built, or cultivated in any way afterwards—it would be a contradiction in terms to say that they had inhabited and cultivated these lots under the Spanish government ; and what would be true of them in the aggregate, is equally true when applied to each individual. Madam Rochon's possession was under the British,

not the Spanish government; and this report, which certifies the facts, and does not give in terms the opinion of the commissioner as to whether the claims should be confirmed, fails to show that it falls within the class recommended for confirmation. Claims of this kind might well, we think, have constituted a distinct class, and no doubt would have been reported upon as such, had the commissioner, under the powers vested in him, deemed them proper for confirmation. Doubtless there were a number of similar sufferers from the casualties of the war. But they were not recommended as proper to be confirmed, and it is not for the courts to speculate upon the justice or propriety of withholding the sanction of the government of their validity. We must take the act, with the report and the accompanying proof, as we find them; and if from the report, as explained and aided by the proof, we are unable to see that in the opinion of the commissioner they ought to be confirmed, it is our duty to hold that the act confers no title, or gives no validity to such claims.—Doe *ex dem.* Hall v. Root, 19 Ala. 378-395.

The appellees, however, insist that their confirmation is established by analogy to the case of Doe v. Eslava (9 How. Rep. 421), where the report was "Cultivation and inhabitation:—A house built, in which R. Farmer lived for twenty years, and until the Spaniards took possession of the country." The proof in that case, also, showed that the house was burned when the Spaniards took possession of the country, upon the treaty after the close of the American revolution.

We have looked into that case, and it appears that no question as to the fact of confirmation was raised, either in the Supreme Court of this State, or of the United States. This point appears to have passed unnoticed; and while this, of itself, is persuasive to show that the report in the case before us may recommend the claim for confirmation, yet we do not esteem it in the light of a judicial determination of the question; for if it could be viewed in that light, it would be our duty, as well as our pleasure, to yield to the decision.

In conclusion, we feel quite confident that Madam Rochon's residence upon the lot in question while the British held possession, and the burning of her house and improvements by the British *pending* the siege by the Spanish army, in the

absence of any proof that she afterwards dwelt upon or cultivated the lots, do not show she inhabited and cultivated the lot under the Spanish government, as recommended by the report and required by the act of 8th May, 1822, in order to a confirmation. To meet the requisitions of the act, she must have lived upon the lot,—inhabited it and cultivated it after Spain took possession of the place. Constructive possession, or the bare assertion of a claim, without an actual possession, is not sufficient. She must have dwelt upon, or inhabited the lot,—must have had such possession under the Spanish government as that the Spanish laws would have operated upon it as a present actual possession. If we depart from the plain, common-sense meaning of the terms used by the commissioner, all is uncertainty. We will be at sea without chart or compass. If an inhabitation one day, or two days, before the Spanish authority came in, may suffice, why may not one year, or two years? Where shall we stop? and by what rule shall we be governed? The only safe rule is, to require inhabitation and cultivation after the place was subject to the dominion of Spain and governed by Spanish laws.

As the claim of the plaintiffs below was shown not to fall within this class of cases, we feel constrained to hold, that it was not confirmed by the act, and consequently, that they showed no title to the lot sued for. The view we have felt it our duty to take upon the question of confirmation is opposed to several of the charges given by the primary court; and as it will probably be conclusive of the case, so far as the State courts are concerned, we deem it unnecessary to notice the other points raised upon the argument.

Judgment reversed, and cause remanded.